IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
FEBRUARY 15, 2005 Session

## REGINA HELDERMAN and husband, TROY HELDERMAN v. MATTHEW R. SMOLIN, M.D., ET AL.

Direct Appeal from the Circuit Court for Madison County
No. C-00-148     Don H. Allen, Judge

No. W2004-01206-COA-R3-CV - Filed April 18, 2005

This appeal involves a claim for medical malpractice. The plaintiff's cardiologist initially diagnosed her as having a heart condition which required surgery to repair. The plaintiff's cardiologist referred the plaintiff to a cardiothoracic surgeon for surgical repair of the condition. The plaintiff subsequently sought a second opinion, and the second cardiologist determined that the plaintiff did not need surgery. Thereafter, the plaintiff's original cardiologist apparently changed his diagnosis of the plaintiff's condition. After some time passed, the cardiothoracic surgeon performed surgery on the plaintiff, which was ultimately determined to be unnecessary. The plaintiff sued her original cardiologist and the cardiothoracic surgeon for medical malpractice. Through discovery, it was determined that the cardiothoracic surgeon did not review the plaintiff's entire medical records prior to performing the surgery. The cardiologist filed a motion for summary judgment arguing the cardiothoracic surgeon was the sole proximate cause of the plaintiff's injuries. In response, the plaintiff submitted an affidavit from her expert witness stating that the cardiologist had a duty under the applicable standard of care to directly communicate his changed diagnosis to the cardiothoracic surgeon, and his actions were a "significant contributing factor" to the plaintiff's injuries. The cardiologist filed a motion to strike the affidavit of the plaintiff's expert as contradictory to his deposition testimony. The trial court partially granted the cardiologist's motion. After doing so, the trial court granted the cardiologist's motion for summary judgment. The plaintiff appealed to this Court, and we reverse.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded

ALAN E. HIGHERS, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

J. Houston Gordon, Covington, TN for Appellants

Charles M. Purcell, Andrew V. Sellers, Jackson, TN, for Appellees

**OPINION**

**I.**

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

In 1997, Regina Helderman's ("Helderman" or "Appellant") primary care physician referred her to Dr. Matthew R. Smolin ("Dr. Smolin" or "Appellee"), a cardiologist practicing in Jackson, Tennessee, after Helderman reported having chest pains. On May 12, 1997, Dr. Smolin performed a transesophageal echocardiogram on Helderman to determine whether she had an atrial septal defect.[1] As a result of this test, Dr. Smolin determined that Helderman did, in fact, have an atrial septal defect. On May 14, 1997, Dr. Smolin performed a cardiac catheterization on Helderman to determine whether the atrial septal defect was hemodynamically significant, thereby requiring surgery to repair.[2] As a result of this test, Dr. Smolin diagnosed Helderman with a hemodynamically significant defect.

After performing these tests, Dr. Smolin referred Helderman to Dr. Arthur Grimball ("Dr. Grimball"), a cardiothoracic surgeon, for an evaluation to determine whether surgery was needed to close the atrial septal defect. Dr. Grimball evaluated Helderman the same day as the cardiac catheterization and determined that Helderman required surgery to repair the defect in her heart. He scheduled Helderman's surgery for June 3, 1997. The record contains a document entitled "Outpatient Summary" dated May 14, 1997, which indicates that Dr. Smolin changed his diagnosis to reflect that Helderman had a hemodynamically insignificant atrial septal defect. This document also indicates that Dr. Smolin forwarded it to Dr. Grimball. However, the document states that Dr. Smolin did not dictate it until June 6, 1997, and it was not transcribed until June 9, 1997.

Helderman subsequently obtained a referral from her primary care physician to seek a second opinion. On May 30, 1997, Helderman visited Dr. James Crenshaw ("Dr. Crenshaw"), a cardiologist. Dr. Crenshaw reviewed the cardiac catheterization report and determined that the atrial septal defect was hemodynamically insignificant, therefore, surgery was not required. Armed with this new information, Helderman left Dr. Crenshaw's office and proceeded directly to Dr. Smolin's office where she confronted him with Dr. Crenshaw's findings. According to Dr. Smolin, he reviewed the testing data and concluded that the laboratory computer performing the test had made an error. Dr. Smolin asserts that he recalculated the data by hand and determined Helderman's atrial septal defect to be insignificant, and he advised Helderman that no surgery would be required to fix the defect. Dr. Smolin's office notes from May 30, 1997, show that he noted the computer error, determined Helderman's atrial septal defect to be insignificant, and advised her to forgo surgical

---

[1] An atrial septal defect is a "congenital heart defect in which there is an opening between the atria." TABER'S CYCLOPEDIC MEDICAL DICTIONARY 186 (19th ed. 2001).

[2] An atrial septal defect can be either hemodynamically significant or hemodynamically insignificant. If the atrial septal defect is determined to be hemodynamically significant, then surgery is ordinarily required to repair the defect. Should testing reveal the defect to be hemodynamically insignificant, then surgery is usually not required to repair the defect.

repair. According to Dr. Smolin, he forwarded a copy of his May 30, 1997, office notes indicating the corrected diagnosis to Dr. Grimball.

Conversely, Helderman asserts that a different series of events transpired when she visited Dr. Smolin on May 30, 1997. Helderman stated that Dr. Smolin seemed puzzled and agitated by Dr. Crenshaw's findings, and he continued to represent to her that she had a hemodynamically significant atrial septal defect requiring surgery to repair. According to Helderman, Dr. Smolin told her that the laboratory computer may have made a mistake, and he decided to postpone the surgery. Helderman asserts that, prior to leaving Dr. Smolin's office, she never received any further instructions or advice. Helderman never saw Dr. Smolin perform any calculations, and he never called Dr. Grimball while she was present in his office on May 30, 1997. According to Dr. Grimball, he never received any communications from Dr. Smolin alerting him to the fact that the previous calculations were incorrect. In any event, Helderman did not report for surgery on June 3, 1997.

In the interim, Helderman continued to seek treatment from Dr. Smolin at the request of her primary care physicians through the middle of 1999. On January 19, 1999, Helderman went to the emergency room at the Jackson/Madison County General Hospital complaining of fatigue. The emergency room physician's notes state that "[s]he was found to have a very small atrial septal defect back in 1997, felt to be hemodynamically insignificant. She, apparently, initially got some conflicting opinion concerning that."

According to Helderman, in the early part of 1999, Dr. Smolin continuously encouraged her to make an appointment with Dr. Grimball to have the atrial septal defect repaired. On May 12, 1999, Helderman visited Dr. Grimball's office and stated that Dr. Smolin told her to have the atrial septal defect repaired because her symptoms were worsening. After meeting with Helderman, Dr. Grimball reviewed his consultation report from 1997 showing a hemodynamically significant atrial septal defect, discussed the operation with her, and made arrangments to admit her to the hospital for the operation on June 10, 1999. Dr. Grimball admitted to not reviewing any other records prior to scheduling the surgery. Specifically, Dr. Grimball stated that he did not review his own medical records on Helderman prior to scheduling the operation. Thus, he had no knowledge of whether the report allegedly prepared by Dr. Smolin regarding the May 30, 1997, office visit, which set forth his new finding of a hemodynamically insignificant atrial septal defect, was contained in those records.

Dr. Grimball performed the surgery on Helderman on June 10, 1999, as scheduled. As a result, Helderman experienced complications related to the unnecessary surgery. On July 7, 1999, Dr. Crenshaw requested, in writing, that Dr. Smolin's office forward to him all records pertaining to Helderman. Dr. Smolin's office faxed the records to Dr. Crenshaw that same day. Dr. Crenshaw stated that the records forwarded did not contain a copy of Dr. Smolin's May 30, 1997, office note indicating a change in diagnosis, nor did he receive any documents indicating Helderman's atrial septal defect had subsequently been determined to be hemodynamically insignificant.

On May 5, 2000, Helderman, along with her husband, filed a complaint in the Circuit Court of Madison County, Tennessee, against Dr. Smolin individually and his business, Medical Specialty

Clinic, P.C., alleging medical malpractice. In addition, Helderman named Dr. Grimball individually and his business, Cardiothoracic Surgery Center, P.L.C., as defendants.[3] She also secured the services of an expert witness, Dr. David Hansen ("Dr. Hansen").

Thereafter, Dr. Smolin filed a motion for summary judgment with the trial court alleging that Dr. Grimball was the sole proximate cause of Helderman's injuries. In support of his motion, Dr. Smolin submitted his own deposition testimony; the deposition testimony of Dr. Crenshaw, Dr. Grimball, and Dr. Hansen; excerpts from the deposition of Stephanie Geibel ("Ms. Geibel"), records custodian for Dr. Grimball; and relevant portions of Helderman's medical records. Dr. Smolin also submitted the affidavit of his own expert, Dr. Dale Wortham, who opined that Dr. Smolin complied with the applicable standard of care, and that Dr. Grimball's actions were the sole proximate cause of Helderman's injuries. In response to Dr. Smolin's motion, Helderman filed Dr. Hansen's affidavit and his deposition testimony. Helderman also submitted relevant portions of her medical records and excerpts from the depositions of various witnesses.

In his affidavit, Dr. Hansen stated, in relevant part, as follows:

> 7. The misdiagnosis and misreferral in the first instance was a situation that could have been and should have been avoided by the proper communication between Dr. Smolin and Dr. Grimball, the cardiovascular surgeon, when Dr. Smolin learned that he had made an error in his analysis and diagnosis of Ms. Helderman's condition. *Dr. Smolin had an affirmative duty, under the applicable standard of care, to directly communicate with Dr. Grimball that the test results reported to Dr. Grimball calling for surgery were incorrect. If, in fact, as Dr. Grimball testified, he failed to so communicate, such would be a violation of the standard of care.*
>    . . . .
> 15. In sum, *as a result of the negligence of Dr. Smolin which was a significant contributing factor to Regina Helderman being operated on*, Regina Helderman received a serious operation for a condition that she never had and was operated on unnecessarily.

(emphasis added).

---

[3] In May of 2003, the circuit court entered an order, at Helderman's request, dismissing Dr. Grimball and Cardiothoracic Surgery Center, P.L.C., from the lawsuit following a settlement agreement entered into between the parties. Therefore, the instant appeal is only concerned with the resolution of the issues as they relate to Dr. Smolin and Helderman.

Based on these assertions by Dr. Hansen, Dr. Smolin filed a motion to strike Dr. Hansen's affidavit as contradictory to his prior deposition testimony. Dr. Smolin argued that, during his deposition testimony, Dr. Hansen testified that Dr. Smolin adequately communicated to Dr. Grimball, through written communications, that Helderman had a hemodynamically insignificant atrial septal defect which did not require surgery. Additionally, Dr. Smolin argued that Dr. Hansen previously testified in his deposition that Dr. Grimball's failure to review the medical records was the sole cause of the unnecessary surgery.

On April 26, 2004, the trial court entered an order granting in part and denying in part Dr. Smolin's motion to strike the affidavit of Dr. Hansen. The trial court concluded that Dr. Hansen's affidavit contained inconsistent and contradictory statements regarding material facts. Specifically, the trial court ordered stricken the last sentence in paragraph seven (7) of Dr. Hansen's affidavit. Additionally, the trial court ordered stricken from Dr. Hansen's affidavit paragraph fifteen (15) in its entirety. In turn, the trial court concluded that no genuine issues of material fact remained to be decided, and that Helderman failed, as a matter of law, to prove that Dr. Smolin was a proximate cause of her injuries. Accordingly, the trial court granted Dr. Smolin's motion for summary judgment.

Helderman subsequently filed a timely notice of appeal to this Court presenting the following issues for our review:

I.     Whether the trial court erred in partially granting Appellee's motion to strike the affidavit of Appellant's expert witness;
II.    Whether the trial court erred in granting Appellee's motion for summary judgment; and
III.   Whether the trial court erred by invading the province of the jury when the underlying facts relied upon by Appellant's expert witness are "hotly contested."

For the reasons set forth more fully herein, we reverse the decision of the trial court.

## II.
### LAW AND ANALYSIS

In order to establish a claim for medical malpractice, the plaintiff has the burden of proving, by a preponderance of the evidence, the following:

> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115(a) (2003); *see also Kelley v. Middle Tenn. Emergency Physicians*, *P.C.*, 133 S.W.3d 587, 591–92 (Tenn. 2004).

"A party is entitled to summary judgment where he or she establishes that there is no genuine issue as to any material fact and that a judgment may be rendered as a matter of law." *Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003) (citing *Penley v. Honda Motor Co.*, 31 S.W.3d 181, 183 (Tenn. 2000)); *see also* Tenn. R. Civ. P. 56.04 (2003). The party moving for summary judgment has the burden of proving that the motion satisfies these requirements. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997) (citing *Downen v. Allstate Ins. Co.*, 811 S.W.2d 523, 524 (Tenn. 1991)). Once the moving party has established that there is no genuine issue of material fact, the burden shifts to the nonmoving party to demonstrate, by affidavits or other discovery materials, that there is a genuine issue of material fact to be resolved by trial of the matter. *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn. 1993) (citations omitted). "In reviewing a motion for summary judgment, the Court must examine the evidence and all reasonable inferences from the evidence in the light most favorable to the non-moving party." *Stovall*, 113 S.W.3d at 721 (citing *Webber v. State Farm Mut. Auto Ins. Co.*, 49 S.W.3d 265, 269 (Tenn. 2001)). The trial court should grant a motion for summary judgment "only when both the facts and the conclusions to be drawn from the facts permit a reasonable person to reach only one conclusion." *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995) (citing *Byrd*, 847 S.W.2d at 210–11)).

"Our task on appeal is to review the record to determine whether the requirements for granting summary judgment have been met." *Church v. Perales*, 39 S.W.3d 149, 157 (Tenn. Ct. App. 2000). "This court must use the same standard in reviewing a trial court's judgment granting summary judgment." *Prince v. Saint Thomas Hosp.*, 945 S.W.2d 731, 733 (Tenn. Ct. App. 1996) (citing *Clifton v. Bass*, 908 S.W.2d 205, 208 (Tenn. Ct. App. 1995)). Since our inquiry on appeal involves purely questions of law, *Carvell*, 900 S.W.2d at 26, "[t]he standard for reviewing a grant of summary judgment is *de novo* without any presumption that the trial court's conclusions were correct." *Webber*, 49 S.W.3d at 269; *see also Kelley*, 133 S.W.3d at 591; *Bain*, 936 S.W.2d at 622.

Before determining whether the trial court properly granted Dr. Smolin's motion for summary judgment, we must address the trial court's decision to strike portions of Dr. Hansen's affidavit. *See Wilson v. Patterson*, 73 S.W.3d 95, 101 (Tenn. Ct. App. 2001). "In Tennessee, expert testimony is required to establish negligence and proximate cause in malpractice actions unless the alleged malpractice is within the common knowledge of laymen." *Ayers v. Rutherford Hosp., Inc.*, 689 S.W.2d 155, 160 (Tenn. Ct. App. 1984) (citing *Phelps v. Vanderbilt Univ.*, 520 S.W.2d 353 (Tenn. Ct. App. 1974)); *see also* Tenn. Code Ann. § 29-26-115(b) (2003); *Kenyon v. Handal*, 122 S.W.3d 743, 758 (Tenn. Ct. App. 2003); *Stokes v. Leung*, 651 S.W.2d 704, 706 (Tenn. Ct. App. 1982). "In general, questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court." *McDaniel v. CSX Transp., Inc.*, 955

S.W.2d 257, 263 (Tenn. 1997) (citing *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993)); *see also Seffernick v. Saint Thomas Hosp.*, 969 S.W.2d 391, 393 (Tenn. 1998); *Kenyon*, 122 S.W.3d at 759.

A trial court's decisions in this regard are reviewed by this Court under an abuse of discretion standard of review. *Seffernick*, 969 S.W.2d at 393; *Ballard*, 855 S.W.2d at 562; *Kenyon*, 122 S.W.3d at 759. In employing this standard of review, we are mindful of the following:

> Discretionary decisions require conscientious judgment. *See BIF v. Service Constr. Co.*, 1988 Tenn. App. LEXIS 430, 1988 WL 72409, at *2. They must take the applicable law into account and must also be consistent with the facts before the court. *See Overstreet v. Shoney's, Inc.*, 4 S.W.3d at 694. Appellate courts will set aside a discretionary decision only when the trial court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence. *See Overstreet v. Shoney's, Inc.*, 4 S.W.3d at 695. Thus, a trial court's discretionary decision should be reviewed to determine: (1) whether the factual basis for the decision is supported by the evidence, (2) whether the trial court identified and applied the applicable legal principles, and (3) whether the trial court's decision is within the range of acceptable alternatives. *See BIF v. Service Constr. Co.*, 1988 Tenn. App. LEXIS 430, 1988 WL 72409, at *3. Appellate courts should permit a discretionary decision to stand if reasonable judicial minds can differ concerning its soundness. *See Overstreet v. Shoney's, Inc.*, 4 S.W.3d at 695.

*White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999).

The courts of this state adhere to the rule that contradictory statements by the same witness regarding a single fact will cancel each other out. *Wilson v. Patterson*, 73 S.W.3d 95, 103–04 (Tenn. Ct. App. 2001) (citing *State v. Matthews*, 888 S.W.2d 446, 449 (Tenn. Crim. App. 1993)); *see also Tibbals Flooring Co. v. Stanfill*, 410 S.W.2d 892, 896 (Tenn. 1967); *Church v. Perales*, 39 S.W.3d 149, 169–70 (Tenn. Ct. App. 2000); *Gambill v. Middle Tenn. Med. Ctr., Inc.*, 751 S.W.2d 145, 149–50 (Tenn. Ct. App. 1988); *Taylor v. Nashville Banner Publ'g Co.*, 573 S.W.2d 476, 482 (Tenn. Ct. App. 1978). If determined by the trial court to be contradictory, the statements by the witness are considered to be "no evidence" of the fact sought to be proved. *Wilson*, 73 S.W.3d at 104 (citing *Johnston v. Cincinnati N.O. & T.P. Ry. Co.*, 240 S.W. 429, 436 (Tenn. 1922)). The policy for such a rule can be stated as follows:

> If parties in court were permitted to assume inconsistent positions in the trial of their cause, the usefulness of courts of justice would in most cases be paralyzed. The coercive powers of the law, available only between those who consented to its exercise, could be set at

naught by all. But the rights of all men are in the keeping of the
courts, and consistency of proceeding is therefore required of all those
who come in or are brought before them. It may accordingly be laid
down as a broad proposition that one, without mistake induced by the
opposite party, who has taken a particular position deliberately, in the
course of litigation, must act consistently with it. One cannot play
fast and loose.

*Stamper v. Venable*, 97 S.W. 812, 813 (Tenn. 1906); *see also Sipe v. Porter*, No. E2002-02938-
COA-R9-CV, 2003 Tenn. App. LEXIS 763, at *9 (Tenn. Ct. App. Oct. 30, 2003).

The "cancellation rule" only applies, however, "when the inconsistency in the witness's
testimony is unexplained and when neither version of his testimony is corroborated by other
evidence." *Taylor*, 573 S.W.2d at 483. As our supreme court has stated,

The question here is not one of the credibility of a witness or
of the weight of evidence; but it is whether there is any evidence at all
to prove the fact. If two witnesses contradict each other there is proof
on both sides, and it is for the jury to say where the truth lies; but if
the proof of a fact lies wholly with one witness, and he both affirms
and denies it, and there is no explanation, it cannot stand otherwise
than unproven. For his testimony to prove it is no stronger than his
testimony to disprove it, and it would be mere caprice in a jury upon
such evidence to decide it either way.

*Johnston*, 240 S.W. at 436. "When the cancellation rule is invoked at the summary judgment stage
to challenge evidence opposing the motion, the courts must view the challenged evidence in the light
most favorable to the opponent of the motion." *Church*, 39 S.W.3d at 170; *see also Wilson*, 73
S.W.3d at 104.

Upon reviewing the statements made by Dr. Hansen in his affidavit and deposition in the
light most favorable to Helderman, we conclude that, contrary to the trial court's holding, they are
not contradictory. Regarding paragraph seven (7) of Dr. Hansen's affidavit, addressing the standard
of care applicable in this case, the trial court found, in relevant part, as follows:

In comparing Dr. Hansen's affidavit testimony to that of his
deposition testimony, this Court concludes that *if Dr. Smolin
communicated "verbally or in writing" his opinion to Dr. Grimball
that surgery for Mrs. Helderman's condition was not needed, then
either form would be acceptable under the applicable standard of
care and thus no violation of the standard of care would be found.*
This conclusion is reached whether the treating cardiothoracic
surgeon, Dr. Grimball read, followed, or ignored such advice that

-8-

surgery was not needed.  Consequently, the Court orders that the last sentence of paragraph 7 from Dr. Hansen's affidavit is to be stricken.  This sentence specifically provides, "*if, in fact, as Dr. Grimball testified, he failed to so communicate, such would be a violation of the standard of care*."

(emphasis added).  In his deposition, Dr. Hansen testified concerning the standard of care as follows:

> Q.      What is the standard of care for a cardiologist practicing in the Jackson-Madison County area to communicate his or her findings about whether surgery is or is not necessitated to the cardiothoracic surgeon?
> A.      *I think that communication can occur verbally or it can — it can occur in the form of a written communication, either one would be acceptable.*

(emphasis added).

In an effort to show an inconsistency between Dr. Hansen's statements, Dr. Smolin points to the following testimony offered by Dr. Hansen during his deposition:

> Q.      Let's talk about communication for just a moment.  Communication comes in many different forms, I take it, does it not?
> A.      Yes.
> Q.      There is the communication where you and I are talking to one another directly here, and there's also the communication of just like Mr. Gordon who sent you a letter, provided some information to you and communicated to you his perspective of the case.  True?
> A.      Yes.
>         . . . .
> Q.      Let me take a couple of examples with you and you tell me if they're acceptable.  Let's say that I'm the cardiologist and you're the cardiothoracic surgeon and I determine that a patient has an insignificant atrial septal defect. . . . And let's say that I have made that determination as the cardiologist, and I see you out in the hallway at the hospital.  Obviously I go up to you and I say, Dr. Hansen, I want to tell you I saw Mrs. Helderman the other day and she does not need to have surgery because the atrial septal defect is insignificant.  That would be an example of perfectly acceptable verbal

communication to — from me to you as the cardiothoracic surgeon. True?

A. Yes.

. . . .

Q. Let's take the written communication. Suppose that I as the cardiologist examine Mrs. Helderman and I make the determination that she does not need to have surgery to repair the atrial septal defect. I write that up in my report and I carbon copy you on that report. Is that within the standard of care for cardiologists communicating to cardiothoracic surgeons in Jackson-Madison County about the cardiologist's opinions that surgery is not needed?

A. Yes.

Regarding the outpatient summary created by Dr. Smolin, Dr. Hansen testified as follows:

Q. At the bottom of the outpatient summary there are two names that are carbon copied. The first is Dr. Grimball, correct?

A. Yes.

. . . .

Q. In your opinion, this would be an acceptable and completely compliant with the standard of care for communications of cardiologists in the Jackson-Madison County area of Dr. Smolin's opinion that this was hemodynamically insignificant to Dr. Grimball?

A. Yeah, that's an acceptable way of communicating to Dr. Grimball, although it strikes me that it's only acceptable by virtue of the fact that the patient failed to show for surgery on June the 3rd because this document was not — which was the originally scheduled date for surgery — because this document is not dictated until five days after she would have had the operation to begin with.

So I think, you know, had the patient actually had the operation and then some time later this note shows up on Dr. Grimball's desk saying, by the way, you shouldn't have done the surgery because it's hemodynamically insignificant. I think that would have been a breach and so it's only by the good fortune that the patient didn't show up that this is acceptable.

Furthermore, during his deposition, Dr. Hansen expressed his opinion that Dr. Grimball did, in fact, receive notice from Dr. Smolin of his changed diagnosis, testifying as follows:

THE WITNESS: It's my understanding that the outpatient summary that was dictated on June 8th, 1997, was carbon copied to Dr. Grimball. It's — and I have — it is my belief that more likely than not that actually arrived in his office and was in his medical records and his possession. Sometime thereafter it was transcribed on June 9th, 1997.

BY MR. PURCELL:

Q. So is it your opinion then that Dr. Smolin did communicate with Dr. Grimball by way of that outpatient summary and advised Dr. Grimball that Mrs. Helderman had a hemodynamically insignificant atrial septal defect?

A. I think that — I think that communication through the carbon copy does that.

However, Dr. Smolin and the trial court overlook the fact that whether Dr. Smolin did, in fact, send notice of his amended diagnosis to Dr. Grimball remains a disputed fact in this case. Dr. Grimball testified in his deposition that he never received notice from Dr. Smolin. Dr. Smolin testified in his deposition that he forwarded a copy of his changed diagnosis to Dr. Grimball. Dr. Crenshaw testified in his deposition that, when he requested Helderman's medical records from Dr. Smolin following her surgery, they contained no document showing Dr. Smolin had changed his diagnosis to reflect that Helderman had a hemodynamically insignificant atrial septal defect. Ms. Geibel testified that, while Dr. Smolin's amended diagnosis was currently in Helderman's medical records, she could not say when that document was placed in the records.

Dr. Hansen recognized the existence of this disputed fact when he stated in his affidavit: "*If, in fact*, as Dr. Grimball testified, [Dr. Smolin] failed to so communicate, such would be a violation of the standard of care." (emphasis added). That this fact remains to be decided is further evidenced by Dr. Hansen's own deposition testimony, wherein he stated:

Q. "Dr. Hansen is expected to testify that Dr. Smolin had an affirmative duty to directly communicate to Dr. Grimball that his report of a hemodynamically insignificant atrial septal defect and his communication to Dr. Grimball of the same were incorrect and, therefore, no surgery was indicated." Is that a correct statement of your anticipated testimony?

A. Yes.

Q. "*Assuming Dr. Grimball's testimony to be correct that no such communication was ever received by him*, Dr. Hansen is expected to render an opinion that there was a violation of the standard of care on the part of Dr. Smolin and/or his clinic staff for which he is responsible." Is that a correct statement of your anticipated testimony?

A. Yes.

-11-

. . . .

Q.      Is it your opinion that at no time did Dr. Smolin ever communicate to Dr. Grimball that Mrs. Helderman had an insignificant atrial septal defect?

A.      Based on my reading of both Dr. Grimball's deposition and Dr. Smolin's deposition, I did not find either one of them claiming there was such a communication. That's my basis for that opinion. *I'd be happy to change that opinion if under oath either or both of them swore to the fact that there was such a communication.*

(emphasis added).

In order for the trial court to conclude that Dr. Hansen's statements were inconsistent, it necessarily had to find that Dr. Grimball received some form of notice from Dr. Smolin prior to conducting Helderman's surgery. In order so to find, the court would need to weigh the evidence and determine that Dr. Grimball did, in fact, receive Dr. Smolin's corrected diagnosis. We reach this conclusion by referencing the language of the court's order, stating:

> In comparing Dr. Hansen's affidavit testimony to that of his deposition testimony, this Court concludes that <u>if</u> Dr. Smolin communicated "verbally or in writing" his opinion to Dr. Grimball that surgery for Mrs. Helderman's condition was not needed, then <u>either</u> form would be <u>acceptable</u> under the applicable standard of care and thus no violation of the standard of care would be found.

The court goes on to note that Dr. Hansen testified that it is acceptable for a cardiologist to send the surgeon a carbon copy of his report, and outpatient summaries and other reports are acceptable forms of written communications between the cardiologist and the surgeon. Thus, in order to find an inconsistency, the court necessarily had to conclude that the parties did not dispute whether Dr. Smolin ever sent notice to Dr. Grimball. At this preliminary stage in the proceedings, the trial court is not permitted to weigh the evidence. *Church v. Perales*, 39 S.W.3d 149, 171 (Tenn. Ct. App. 2000); *see also Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn. 1993). "When a material fact is in dispute creating a genuine issue, when the credibility of witnesses is an integral part of the factual proof, or when evidence must be weighed, a trial is necessary because such issues are not appropriately resolved on the basis of affidavits." *Byrd*, 847 S.W.2d at 216.

Based upon our review of the testimony proffered by Dr. Hansen in his affidavit and deposition, we conclude that Dr. Hansen's statements regarding the standard of care are not inconsistent. The term "directly communicate" is susceptible of being interpreted to mean either verbal or written communication, which is consistent with his prior deposition testimony. Although Dr. Hansen expressed his opinion that Dr. Smolin did provide written notice of his changed diagnosis to Dr. Grimball, he also noted that this opinion is contingent upon the evidence offered at

trial. When the testimony of a witness is susceptible of multiple interpretations, one of which would produce no inconsistency, we are reluctant to apply the "cancellation rule." *See Gambill v. Middle Tenn. Med. Ctr., Inc.*, 751 S.W.2d 145, 151 (Tenn. Ct. App. 1988). Instead, "the meaning of relevant oral statements made by or to a party . . . is a fact question for a jury to consider in weighing the possible contradictions in and credibility of the testimony of the witness, rather than a law question for determination by the Trial Judge on motion for summary judgment or directed verdict." *Id.* (citing *Packet Co. v. Hobbs*, 58 S.W. 278 (Tenn. 1900)); *see also Ledford v. Francis*, 1988 Tenn. App. LEXIS 813, at *13–14 (Tenn. Ct. App. Dec. 14, 1988).

Turning to paragraph fifteen (15) in Dr. Hansen's affidavit concerning causation, the trial court held that this paragraph should be stricken in its entirety as contradictory to Dr. Hansen's deposition testimony. Dr. Hansen offered the following testimony during his deposition:

> Q.    *Is it not the case that the cardiothoracic surgeon is the one who will determine whether he or she will operate on the patient?*
>
> A.    *Yes.*
>
> Q.    The decision whether to ultimately perform an atrial septal defect rests with the cardiothoracic surgeon in Jackson-Madison County, does it not?
>
> A.    Yes.
>
>        . . . .
>
> Q.    *Are you of the opinion then that Dr. Grimball breached the standard of care for cardiothoracic surgeons practicing in Jackson-Madison County, Tennessee, in completely ignoring the hospital records before performing the surgery on Mrs. Helderman?*
>
> MR. GORDON:    Object to the form of the question.
>
> THE WITNESS:    Yes
>
> Q.    Are you also of the opinion that Dr. Grimball breached the standard of care for cardiothoracic surgeons practicing in Jackson-Madison County in performing surgery on Mrs. Helderman without the benefit of a history pertaining to what had happened to her in her care and treatment from May 17th, 1997, until May 19th, 1997?
>
> A.    Yes.
>
>        . . . .
>
> Q.    And Mr. Gordon has asked you to assume certain things that may or may not have been said, but from your perspective on what we know, given that you just said there, that Dr. Smolin says it's hemodynamically insignificant, *what we do know is that had Dr. Grimball reviewed the hospital charts and his own records, he would have found the same thing that you did*

> *reviewing his records, and that is that you, and that is that Dr. Smolin and Dr. Crenshaw believe this was a hemodynamically insignificant atrial septal defect.*
>
> A. *I'd go stronger than that.* I'd say not only would he have, but he had an obligation to find that, so yeah, I agree with you but I'd be a little stronger about it. I really condemn the fact that this patient got an operation without looking at the medical records. That just seems like a practice that needs to be condemned.
>
> Q. And because he failed to fulfill that obligation, the surgery happened?
>
> A. *That's the only way it could have happened, yes.*

(emphasis added).

Upon reviewing Dr. Hansen's deposition as a whole, *Johnston v. Cincinnati, N.O. & T.P. Ry. Co.*, 240 S.W. 429, 435 (Tenn. 1921), we conclude that Dr. Hansen's statements regarding causation are not contradictory. From the aforementioned testimony, it is clear that Dr. Hansen's opinions regarding causation are based upon his *assumption* that Helderman's medical records contained documentation indicating that Dr. Smolin had changed his diagnosis. As previously discussed, whether such documentation was, in fact, contained in her medical records at the time of her surgery is a disputed issue of fact which we must view in the light most favorable to the opponent of the motion at this preliminary stage. *Wilson v. Patterson*, 73 S.W.3d 95, 104 (Tenn. Ct. App. 2001); *Church v. Perales*, 39 S.W.3d 149, 170 (Tenn. Ct. App. 2000).

Additionally, we note that the aforementioned deposition testimony relied upon by the trial court in ruling on Dr. Smolin's motion to strike was offered in response to questions addressing whether Dr. Grimball breached the standard of care. During his deposition, Dr. Hansen also provided the following testimony:

> Q. "*Assuming Dr. Grimball's testimony to be correct that no such communication was ever received by him*, Dr. Hansen is expected to render an opinion that there was a violation of the standard of care on the part of Dr. Smolin and/or his clinic staff for which he is responsible." Is that a correct statement of your anticipated testimony?
>
> A. Yes.
>
> . . . .
>
> Q. *Is it your opinion that Dr. Smolin breached the standard of care in his initial diagnosis that the atrial septal defect was, in fact, significant and surgery was therefore warranted?*
>
> A. *My answer to that would be, yes, I believe it's below the standard of care to have ever thought that this patient had a*

> > *hemodynamically significant atrial septal defect.* I think that was a mistake that it was possible to recover from them because the patient actually didn't go off to surgery, so it's one of these mistakes where at least initially there was no harm done and so there's a chance for correction at that point.
> > . . . .
>
> Q. We've been talking about cardiologists and cardiothoracic surgeons without really allowing you to define those, . . . I would like for you to define for me the scope of the cardiologist's work versus the scope of the cardiothoracic surgeon's work. Would you please do that for me?
>
> A. Certainly. Cardiologists and cardiovascular surgeons start from different starting points. . . . That the cardiologist is *involved with the assessment, diagnosis and treatment* of disorders of the heart and the vascular system, and — but would not perform a surgical procedure that required an open heart surgery. . . .
>
> The surgeon, on the other hand, is *not so involved in the diagnosis and medical treatment of a patient as he is with the surgical treatment* of their — the problems that relate to the heart and the vascular system. So that would be the difference between the two.

(emphasis added). It is not entirely clear, as the trial court held, that Dr. Hansen testified in his deposition that Dr. Grimball is the sole proximate cause of Helderman's injuries. As with his testimony regarding the standard of care, any contradictions in Dr. Hansen's testimony regarding issues of disputed fact are properly left to the jury in weighing his testimony and assigning credibilty. *Gambill v. Middle Tenn. Med. Ctr., Inc.*, 751 S.W.2d 145, 151 (Tenn. Ct. App. 1988).

"At the present preliminary stage of the proceedings, there should not be a dismissal for inconsistency in testimony of a witness unless it represents an unequivocal and irreconcilable conflict." *Id*. at 151–52. Accordingly, we find that the trial court abused its discretion in striking portions of Dr. Hansen's affidavit.

After striking portions of Dr. Hansen's affidavit relating to the standard of care and causation, the trial court proceeded to grant Dr. Smolin's motion for summary judgment, stating:

> 2. The Motion for Summary Judgment on behalf of the Defendants, Dr. Smolin and the Medical Specialty Clinic, P.C. is granted.
>
> The Court finds that no genuine issue as to any material facts exist in this cause. Furthermore, the Plaintiffs have failed to show any proof that Dr. Smolin or his clinic was a proximate cause or a

contributing cause to Mrs. Helderman's surgery or to her suffering injuries. Plaintiff's own expert, Dr. Hansen, in his deposition testimony clearly places the sole proximate causation of Mrs. Helderman having to undergo surgery upon Dr. Grimball's actions or inactions. The Plaintiff has failed to meet the burden of proving by expert evidence that Dr. Smolin or his clinic breached the standard of care in this cause, or that Dr. Smolin's negligent act or omission was the proximate cause of Mrs. Helderman's suffering same injuries.

Upon conducting a *de novo* review of the record, we cannot agree. As previously discussed, the seemingly inconsistent opinions offered by Dr. Hansen regarding the standard of care and causation are based upon the ultimate resolution of factual disputes to be decided by a jury.

"There can be more than one proximate cause of an injury." *Stokes v. Leung*, 651 S.W.2d 704, 708 (Tenn. Ct. App. 1982); *see also Roberts v. Robertson County Bd. of Educ.*, 692 S.W.2d 863, 871 (Tenn. Ct. App. 1985). "There is no requirement that a cause, to be regarded as the proximate cause of an injury, be the sole cause, the last act, or the one nearest to the injury, provided it is a substantial factor in producing the end result." *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991); *see also Jennings v. Case*, 10 S.W.3d 625, 629–30 (Tenn. Ct. App. 1999) (citing *Bass v. Barksdale*, 671 S.W.2d 476 (Tenn. Ct. App. 1984)). As our supreme court has stated,

> The general rule is that what is the proximate cause of an injury is a question for the jury; the court instructing them as to what the law requires to constitute it, and the jury applying the law to the facts. But whether the question is one to be determined by the jury depends on the facts of each case. Thus where the facts of the particular case are controverted, and are of such a character that different minds might reasonably draw different conclusions therefrom, a question of facts is presented properly determinable by the jury. . . . But when the facts are undisputed and are susceptible of but one inference, the question is one of law for the court.

*Fairbanks, Morse & Co. v. Gambill*, 222 S.W. 5, 10 (Tenn. 1919) (citations omitted); *see also Southeastern Greyhound Lines, Inc. v. Groves*, 136 S.W.2d 512, 517 (Tenn. 1940).

Helderman has established that a genuine issue of material fact remains in this case, i.e., at what point, if at all, did Dr. Smolin's amended diagnosis find its way into her medical records. Helderman's expert witness, drawing certain inferences from the facts in her favor, purports to testify that Dr. Smolin breached the applicable standard of care and was a proximate cause of her injuries. Conversely, Dr. Smolin's expert witness, drawing certain inferences from the facts in his favor, purports to testify that Dr. Smolin did not breach the applicable standard of care, and Dr. Grimball was the sole proximate cause of Helderman's injuries. *See Anders v. Stubblefield*, No. 189, 1989 Tenn. App. LEXIS 341, at *5 (Tenn. Ct. App. May 9, 1989) (finding summary judgment

inappropriate where the parties' experts assumed certain facts were true when rendering their opinions). Taking the facts in the light most favorable to Helderman, the evidence regarding whether Dr. Smolin actually communicated his changed diagnosis to Dr. Grimball remains in dispute and is subject to numerous inferences. *See Prince v. Saint Thomas Hosp.*, 945 S.W.2d 731, 733–35 (Tenn. Ct. App. 1996). Accordingly, the trial court erred in taking this fact to be undisputed and granting Dr. Smolin's motion for summary judgment.

### III.
#### CONCLUSION

For the reasons set forth herein, we reverse the decision of the trial court and remand this case for further proceedings consistent with this opinion. Costs of this appeal are to be taxed to the Appellee, Dr. Matthew Smolin, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE