IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
May 4, 2010 Session

## ESTATE OF MARTHA S. FRENCH v. STRATFORD HOUSE ET AL.

**Appeal by Permission from the Court of Appeals, Eastern Section**
**Circuit Court for Hamilton County**
**No. 04C490       L. Marie Williams, Judge**

_____

**No. E2008-00539-SC-R11-CV - Filed January 26, 2011**

_____

WILLIAM C. KOCH, JR., J., dissenting in part.

This appeal involves important questions regarding the process for adjudicating the liability of nursing homes for injuries to their residents. In particular, it requires this Court to articulate the principles that should be used to decide whether a claim based in part on the conduct of a certified nursing assistant ("CNA") should be treated as a medical malpractice claim or as an ordinary negligence claim. The Court has determined that claims involving the adequacy of CNAs' training, the sufficiency of the staffing at a particular nursing home, and the adherence of CNAs to a patient's plan of care are ordinary negligence claims that can be substantiated without the introduction of expert proof. The Court has also decided that the negligence per se doctrine permits the use of federal and state regulations regarding the licensing of nursing homes to create and define the scope of the duty of care that nursing homes owe to their patients. I cannot concur with either decision.

**I.**

Martha French, a registered nurse, suffered two debilitating strokes. In 2000, following the second stroke, she was admitted to the Highland Manor Nursing Home in Portland, Tennessee. In April 2003, she was transferred to Stratford House in Chattanooga, Tennessee.

In mid-July 2003, approximately three months after being admitted to Stratford House, Ms. French's blood pressure dropped, and she developed a low-grade fever. The Stratford House staff presented Ms. French's daughter with the option of hospitalizing her mother or placing her mother in hospice care. Ms. French's daughter decided that her mother should be hospitalized, and accordingly, Ms. French was admitted to Erlanger Medical Center on

July 23, 2003. The staff at Erlanger Medical Center initially treated Ms. French aggressively. However, when it became apparent that respiratory failure was imminent, the staff recommended, and Ms. French's daughter agreed, that she should receive "comfort care only." Ms. French died on July 26, 2003.

On March 22, 2004, Ms. French's daughter, acting as the representative of her mother's estate, filed suit in the Circuit Court for Hamilton County against Stratford House and other defendants seeking compensatory and punitive damages. The complaint included claims based on (1) medical malpractice, (2) common-law negligence, (3) violations of federal and state regulations governing the licensing and approval of nursing homes, and (4) violations of the Tennessee Adult Protection Act.[1] All of these claims are based on the assertions that inattention and neglect resulting from the understaffing of CNAs at Stratford House caused Ms. French to develop pressure sores, that these pressure sores became necrotic because they were not properly treated, and that the infected pressure sores caused the sepsis that resulted in Ms. French's death. Stratford House responded that Ms. French's death was the result of pulmonary failure that was caused by the aggressive treatment Ms. French initially received at Erlanger Medical Center.

Stratford House filed motions for partial summary judgment concerning all the estate's allegations under the Tennessee Adult Protection Act and the punitive damages claims. Following discovery, the trial court entered a series of four orders between October 11, 2006 and January 18, 2008, that (1) granted the partial summary judgment dismissing the Tennessee Adult Protection Act claims, (2) granted the partial summary judgment dismissing the punitive damages claims, (3) granted a partial summary judgment dismissing the negligence per se and common-law negligence claims, and (4) declared these judgments final in accordance with Tenn. R. Civ. P. 54.02 in order to permit the estate to pursue an appeal as of right under Tenn. R. App. P. 3.

The estate perfected an appeal. In its unanimous opinion, the Court of Appeals determined that "the gravamen of the [estate's] case sounds in medical malpractice" and held that the medical malpractice statute "governs this litigation." *Estate of French v. Stratford House*, No. E2008-00539-COA-R3-CV, 2009 WL 211898, at *8 (Tenn. Ct. App. Jan. 29, 2009). The court also affirmed the trial court's dismissal of the estate's negligence per se claims and Tennessee Adult Protection Act claims. *Estate of French v. Stratford House*, 2009 WL 211898, at *10-11. Finally, the Court of Appeals determined that the trial court erred by dismissing the estate's punitive damages claims. *Estate of French v. Stratford House*, 2009 WL 211898, at *11. We granted the estate's application for permission to appeal.

---

[1]Tenn. Code Ann. §§ 71-6-101 to -124 (2004 & Supp. 2010).

## II.

Nursing homes are far more than residential facilities. They provide continuous care for "persons who are not acutely ill, but who do require skilled nursing care and related medical services."[2] These services are "beyond the basic provision of food, shelter and laundry" and must be provided on a "twenty-four (24) hours per day" basis.[3] It is the provision of skilled nursing services that distinguishes nursing homes from "adult care home[s],"[4] "assisted-care living facilit[ies],"[5] and "home[s] for the aged."[6] A person requiring "skilled nursing care is one whose medical condition requires full-time medical supervision." 26 Albert W. Secor et al., *Tennessee Practice: Elder Law* § 9:6, 116-17 (2009-2010).

Nursing homes must be licensed by the Board for Licensing Health-Care Facilities.[7] They must satisfy rigorous staffing requirements, as well as staff educational requirements. Many of these requirements are imposed by the federal Nursing Home Reform Act of 1987[8] and by state law. Nursing homes must employ both a full-time licensed administrator[9] and a full-time director of nursing who must be a licensed registered nurse.[10] In addition, they are required to retain a licensed physician to serve as medical director or consultant who is responsible for the medical care in the nursing home.[11]

---

[2]Tenn. Code Ann. § 68-11-201(31)(A) (Supp. 2010)

[3]Tenn. Code Ann. § 68-11-201(31)(B).

[4]Tenn. Code Ann. § 68-11-201(3).

[5]Tenn. Code Ann. § 68-11-201(6)(B).

[6]Tenn. Code Ann. § 68-11-201(21)(A).

[7]Tenn. Code Ann. §§ 68-11-202(a), -204(a)(1) (Supp. 2010).

[8]Pub. L. No. 100-203 §§ 4201-06, 101 Stat. 1330 (codified as amended at 42 U.S.C. §§ 1395i-3, 1396r (2006)).

[9]Tenn. Code Ann. § 63-16-111(b) (2010); Tenn. Code Ann. § 68-11-803(b)(6) (Supp. 2010); Tenn. Comp. R. & Regs. 1200-08-06-.04(1) (2010).

[10]Tenn. Code Ann. § 68-11-803(b)(7); Tenn. Comp. R. & Regs. 1200-08-06-.06(4)(b) (2010).

[11]Tenn. Code Ann. § 68-11-803(b)(10); Tenn. Comp. R. & Regs. 1200-08-06-.06(2)(c) - (d).

State statutes and regulations require that at least one registered nurse or licensed practical nurse must be on duty at all times in a nursing home, and at least two nursing personnel must be on duty on every shift.[12] A registered nurse must supervise and evaluate the nursing care of each resident of a nursing home,[13] and residents of nursing homes must receive a minimum of two hours of direct care every day, including 0.4 hours of care by the licensed nursing personnel.[14]

Every resident of a nursing home must be under the care of a physician and must have an individualized plan of care.[15] Accordingly, within fourteen days of admission, a nursing home must conduct a comprehensive assessment of each resident's medical condition and functional capacity.[16] The purpose of this assessment is to develop a written plan of care in order "to attain or maintain the highest practicable physical, mental, and psychological well-being of each patient."[17] One commentator has observed that the individualized plan of care for a nursing home resident defines the standard of care to which the facility can be held accountable. Timothy L. Takacs, *Elder Law Practice in Tennessee* § 13.03 (2d ed. 2010) (quoting H. Kennard Bennett, *Nursing Home: The Care Plan Is a Contract*, presented at Fundamental & Emerging Issues for the Elder Law Practitioner (Nat'l Academy of Elder Law Attorneys, May 14-17, 1997) (Las Vegas, Nevada)).

Residents of nursing homes necessarily receive both skilled nursing care and non-skilled personal care. Differentiating between the two is not always easy. The regulations governing the federal Medicare Program contain non-exhaustive lists of services considered to be "skilled nursing services"[18] and those deemed to be "personal care services."[19] The determination regarding whether a particular service is a skilled nursing service does not necessarily depend on who is providing the service. A skilled service may be provided directly by professional or technical personnel or by others under the supervision of such

---

[12]Tenn. Code Ann. § 68-11-803(b)(8) - (9); Tenn. Comp. R. & Regs. 1200-08-06-.06(4)(a).

[13]Tenn. Comp. R. & Regs. 1200-08-06-.06(4)(e).

[14]Tenn. Comp. R. & Regs. 1200-08-06-.06(4)(d).

[15]Tenn. Comp. R. & Regs. 1200-08-06-.05(1), -.06(4)(f).

[16]42 U.S.C. §§ 1395i-3(b)(3), 1396r(b)(3); 42 C.F.R. § 483.20 (2010).

[17]42 U.S.C. §§ 1395i-3(b)(2), 1395i3(b)(3)(D); 1396r(b)(2); 1396r(b)(3)(D); 42 C.F.R. § 483.30.

[18]*See* 42 C.F.R. § 409.33(b) (2009).

[19]*See* 42 C.F.R. § 409.33(d).

professional or technical personnel.[20] In addition, a service that is ordinarily considered to be non-skilled may be considered skilled if it must be performed or supervised by skilled personnel due to a resident's medical complications.[21]

The manner in which the federal regulations address skin care illustrates the difference between skilled nursing services and personal care services. These regulations recognize that pressure sores may be "unavoidable" depending on a resident's clinical condition.[22] They also characterize "[p]rophylactic and palliative skin care, including bathing and application of creams, or treatment of minor skin problems" as a personal care service.[23] However, they include the "[t]reatment of extensive decubitus ulcers[24] or other widespread skin disorder" as a service that qualifies as a skilled nursing service.[25] Accordingly, with regard to "preexisting acute skin condition[s]," the regulations note that "[a] condition that does not ordinarily require skilled services may require them because of special medical complications."[26]

### III.

Residents of nursing homes are subject to injury in different ways. Injuries may be substantially related to the provision of medical treatment, or they may be unrelated to the provision of medical treatment. In most circumstances, it is relatively easy to determine whether or not the conduct that caused the injury was substantially related to the provision of medical treatment. However, circumstances can arise in the context of injuries to nursing home residents that make this distinction more subtle. *Cf. Draper v. Westerfield*, 181 S.W.3d 283, 290 (Tenn. 2005); *Gunter v. Lab. Corp. of Am.*, 121 S.W.3d 636, 639 (Tenn. 2003). Notwithstanding the difficulty of the task in a particular case, properly characterizing the nature of the injury-causing conduct at the outset of the litigation is necessary because this characterization dictates the plaintiff's burden of proof.

---

[20]*See* 42 C.F.R. §§ 409.31(a)(3), 409.32(a) (2009).

[21]*See* 42 C.F.R. § 409.32(b).

[22]42 C.F.R. § 483.25(c)(1) (2010).

[23]42 C.F.R. § 409.33(d)(5).

[24]A pressure sore is a decubitus ulcer. 9 Lee R. Russ, *Attorneys Medical Advisor* § 114:4 (2010).

[25]42 C.F.R. § 409.33(b)(6).

[26]42 C.F.R. § 409.32(b).

Injuries caused by conduct that is not substantially related to the provision of medical care are governed by ordinary negligence principles. Ordinary negligence claims employ the "reasonable person" standard of care which requires persons to use reasonable care to refrain from conduct that could foreseeably cause injury to others. *See Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355, 357 (Tenn. 2008); *Biscan v. Brown*, 160 S.W.3d 462, 478 (Tenn. 2005). The triers of fact may decide an ordinary negligence claim based on their common, everyday experience without the aid of expert proof.

The same cannot be said for claims involving conduct substantially related to the provision of medical care. Because these claims are ordinarily beyond the common knowledge of lay persons, the "reasonable person" standard of care does not apply. *Moon v. St. Thomas Hosp.*, 983 S.W.2d 225, 229 (Tenn. 1998). These claims must instead satisfy Tenn. Code Ann. § 29-26-115 (Supp. 2010) which, in most cases, requires expert medical proof to establish the three essential elements[27] of the claim. *Cox v. M. A. Primary & Urgent Care Clinic*, 313 S.W.3d 240, 259 (Tenn. 2010); *Moon v. St. Thomas Hosp.*, 983 S.W.2d at 229; *Payne ex rel. Payne v. Caldwell*, 796 S.W.2d 142, 143 (Tenn. 1990); *see also Conley v. Life Care Ctrs. of Am., Inc.*, 236 S.W.3d 713, 729 (Tenn. Ct. App. 2007).[28]

All claims against health care providers are not necessarily covered by Tenn. Code Ann. § 29-26-115. When the claim is based on the injurious conduct of an individual that is not related to the provision of health care, the individual cannot invoke the requirements and protections of Tenn. Code Ann. § 29-26-115 simply because he or she was also a health care provider at the time the injurious conduct occurred.

Prior to 2003, the courts distinguished between ordinary negligence claims and medical malpractice claims using the following test:

---

[27]A plaintiff pursing a claim covered by Tenn. Code Ann. § 29-26-115 must (1) establish the applicable standard of care, (2) prove that the defendant failed to comply with that standard of care, and (3) prove that the defendant's failure to comply with the standard of care caused his or her injuries. Tenn. Code Ann. § 29-26-115(a).

[28]Expert proof is not required in cases governed by Tenn. Code Ann. § 29-26-115 when the alleged acts of malpractice are so obvious that they come within the common knowledge of lay persons. *Cox v. M.A. Primary & Urgent Care Clinic*, 313 S.W.3d at 259-60 n. 23; *Helderman v. Smolin*, 179 S.W.3d 493, 500 (Tenn. Ct. App. 2005); *Kenyon v. Handal*, 122 S.W.3d 743, 758 (Tenn. Ct. App. 2003). As has been colorfully noted, expert proof can be dispensed with when malpractice is "as blatant as a 'fly floating in a bowl of buttermilk' so that all [human]kind knows that such things are not done absent negligence." *Patterson v. Arif*, 173 S.W.3d 8, 12 (Tenn. Ct. App. 2005) (quoting *Murphy v. Schwartz*, 739 S.W.2d 777, 778 (Tenn. Ct. App. 1986)).

> Medical malpractice cases typically involve a medical diagnosis,
> treatment or other scientific matters. The distinction between
> ordinary negligence and malpractice turns on whether the acts
> or omissions complained of involve a matter of medical science
> or art requiring specialized skills not ordinarily possessed by lay
> persons or whether the conduct complained of can instead be
> assessed on the basis of common everyday experience of the
> trier of fact.

*Peete v. Shelby Cnty. Health Care Corp.*, 938 S.W.2d 693, 696 (Tenn. Ct. App. 1996)
(quoting *Grainger v. Methodist Hosp. Healthcare Sys., Inc.*, No. 02A01-9309-CV-00201,
1994 WL 496781, at *3 (Tenn. Ct. App. Sept. 9, 1994), *perm. app. denied* (Tenn. Jan. 3,
1995)); *see also Estate of Doe v. Vanderbilt Univ., Inc.*, 958 S.W.2d 117, 120 (Tenn. Ct.
App. 1997).

This Court did not address the process or the criteria for distinguishing between
ordinary negligence claims and claims governed by Tenn. Code Ann. § 29-26-115 until 2003
when we considered the issue in the context of a claim against a laboratory for negligently
performing a DNA paternity test. In straightforward terms, we held that

> when a claim alleges negligent conduct which constitutes or
> bears a substantial relationship to the rendition of medical
> treatment by a medical professional, the medical malpractice
> statute is applicable. Conversely, when the conduct alleged is
> not substantially related to the rendition of medical treatment by
> a medical professional, the medical malpractice statute does not
> apply.

*Gunter v. Lab. Corp. of Am.*, 121 S.W.3d at 641; *see also Draper v. Westerfield*, 181 S.W.3d
at 291. In fashioning this test, the Court took pains to note that Tenn. Code Ann. § 29-26-
115 was not limited to the conduct of physicians. Because both skilled and non-skilled
personnel frequently carry out a physician's orders, the Court stated that "the medical
malpractice statute [Tenn. Code Ann. § 29-26-115] may extend to acts of non-physicians,
such as nurses, when they are involved in the medical treatment of a patient." *Gunter v. Lab.
Corp. of Am.*, 121 S.W.3d at 640.

Following the *Gunter* decision, the appellate courts were presented with several cases
requiring them to determine whether a claim arising from injuries to nursing home residents
should be considered as an ordinary negligence claim or as a claim covered by Tenn. Code
Ann. § 29-26-115. One such case involved a nursing home resident who fractured his hip

following a bath.  In the ensuing litigation following the resident's death, his estate insisted that the claim for damages for the resident's broken hip should be considered as an ordinary negligence claim because he was being cared for by a CNA at the time of the injury.  The Court of Appeals disagreed.  Citing this Court's decision in *Gunter v. Laboratory Corporation of America*, the court held that

> the plaintiff's allegations involve decisions relating to the care of Mr. Johnsey that necessarily required medical knowledge. We reject the plaintiff's argument that because some of her claims against the nursing home involved actions taken by a certified nursing assistant, the claims were automatically for ordinary negligence.  The medical malpractice statute also extends to acts of non-physicians, such as nurses, when they are involved in the medical treatment of a patient. . . . We find that the decisions at issue here were substantially related to the rendition of medical treatment and are subject to the medical malpractice statute.

*Johnsey v. Northbooke Manor, Inc.*, No. W2008-01118-COA-R3-CV, 2009 WL 1349202, at \*14 (Tenn. Ct. App. May 14, 2009) (No Tenn. R. App. P. 11 application filed) (citations omitted).

In this case, the Court of Appeals again invoked *Gunter's* "substantial relationship" test to determine whether the estate's claim should be treated as an ordinary negligence claim or as a claim governed by Tenn. Code Ann. § 29-26-115.  Unanimously affirming the trial court's decision that the estate's claims were governed by Tenn. Code Ann. § 29-26-115, the court held:

> The Administratrix's allegation of conduct she claims is ordinary negligence such as evaluation of how a particular patient needs to be fed or hydrated, whether the patient is at risk for pressure sores, how often an at-risk patient needs to be turned, how to treat pressure ulcers if they develop, how many caregivers are needed to minister to a particular group of patients and similar allegations, are decisions relating to the care of the Deceased that necessarily involve medical knowledge. These decisions "bear . . . a substantial relationship to the rendition of medical treatment by a medical professional" and are therefore subject to Tennessee's Medical Malpractice Act.

-8-

*Estate of French v. Stratford House*, 2009 WL 211898, at *8.

**IV.**

Since its adoption seven years ago, *Gunter's* "substantial relationship" test has provided helpful guidance to the bench and bar and has produced consistent results. Its focus on the type of care and services being provided, rather than on the status of the persons actually providing the care, has enabled the courts to differentiate between conduct that is substantially related to the exercise of professional judgment regarding the provision of medical care and conduct that is properly amenable to ordinary negligence principles.

Because of her medical condition, Ms. French required continuous skilled care when she was admitted to Stratford House. When she developed pressure sores, these too required skilled care. The estate's claim is that inadequate staffing at Stratford House resulted in the failure of the CNAs to properly reposition Ms. French, that the failure to properly reposition Ms. French caused her to develop pressure sores, that inadequate treatment caused these pressure sores to become infected and necrotic, and finally that these infected pressure sores caused the sepsis that resulted in Ms. French's death. Like the trial court and the Court of Appeals, I cannot envision how lay persons, using only their common, everyday experience without the assistance of expert medical proof, could determine (1) whether Stratford House was properly staffed, (2) whether Ms. French's pressure sores were caused by inadequate care, (3) whether Ms. French's medical condition would have caused her to develop pressure sores notwithstanding the care she received, (4) whether Ms. French's pressure sores would have failed to heal and would have worsened despite the care she received, and (5) whether Ms. French's pressure sores caused the sepsis that resulted in her death.

Apparently, even the estate must have reached the same conclusion because it has already retained two experts to testify regarding these issues. The record shows that the estate has retained a physician who is the medical director at several nursing homes in Arkansas. During discovery, the physician provided expert opinions regarding the applicable standards of care and the cause of Ms. French's pressure sores and her eventual death. The estate has also retained a registered nurse living in Tennessee who has served as the director of nursing at a nursing home in Tennessee. During discovery, this nurse provided expert testimony regarding staffing levels and patient care at nursing homes.

The classification of the estate's claims in this case as either ordinary negligence claims or medical malpractice claims will have no practical effect on the estate's opportunity to present its claims to a jury in this case. The estate has already retained experts who will be able to offer testimony consistent with the requirements of Tenn. Code Ann. § 29-26-115. The effect of this opinion will be felt in other cases in which plaintiffs, pointing to the

Court's decision in this case, will insist that they must be permitted to present similar claims to a jury without expert proof to support them.

## V.

I concur with the Court's conclusion that the negligence per se doctrine cannot be applied to claims governed by Tenn. Code Ann. § 29-26-115. Accordingly, based on my conclusion that all of the estate's claims in this case fall within the scope of Tenn. Code Ann. § 29-26-115, I would find that the negligence per se doctrine has no application in this case.[29]

## VI.

I concur with the Court's conclusion that the trial court erred by granting the summary judgment dismissing the estate's punitive damages claim. However, for the reasons stated, I cannot concur with the Court's decision that some of the estate's claims should be treated as ordinary negligence claims rather than claims under Tenn. Code Ann. § 29-26-115 or with the Court's decision that the negligence per se doctrine has any application in this case. In my judgment, the decision of the Court of Appeals should be affirmed in all respects.

_____
WILLIAM C. KOCH, JR., JUDGE

---

[29]Even if the estate's complaint contained viable ordinary negligence claims, there are significant legal and factual grounds militating against the exercise of this Court's discretion to invoke the negligence per se doctrine with regard to the state and federal regulations relating to the licensing of nursing homes and the approval of nursing homes to receive federal payments for skilled services.