MARY ALICE BOLTON PRINCE,        )
by and through her conservator,  )
James M. Bolton,                 )
                                 )
        Plaintiff/Appellant,     )        Appeal No.
                                 )        01-A-01-9604-CV-00184
v.                               )
                                 )        Davidson Circuit
ST. THOMAS HOSPITAL; HOSPITAL    )        No. 90C-4082
CORPORATION OF AMERICA;          )
HOSPITAL CORPORATION OF AMERICA  )
dba HCA EDGEFIELD HOSPITAL;      )
MILLER MEDICAL GROUP; JACK T.    )
SWAN,M.D.; THOMAS C. FARRAR,     )
M.D.; and LANGDON G. SMITH,M.D.  )
                                 )
        Defendants/Appellees.    )



**FILED**

**November 1, 1996**

**Cecil W. Crowson**
**Appellate Court Clerk**

COURT OF APPEALS OF TENNESSEE

MIDDLE SECTION AT NASHVILLE


APPEAL FROM THE CIRCUIT COURT FOR DAVIDSON COUNTY

AT NASHVILLE, TENNESSEE


THE HONORABLE HAMILTON V. GAYDEN, JR., JUDGE

RANDALL L. KINNARD                ROBERT E. HOEHN
DANIEL L. CLAYTON                 4527 A Highway 70 East
Kinnard & Clayton                 White Bluff, Tennessee  37187
The Woodlawn                      ATTORNEY FOR THOMAS C. FARRAR,M.D.
127 Woodmont Boulevard
Nashville, Tennessee  37205
ATTORNEYS FOR Mrs. Prince/APPELLANT


ROSE P. CANTRELL                  DAVID L. STEED
Parker Lawrence Cantrell & Dean   Cornelius & Collins
200 Fourth Avenue North           2700 Nashville City Center
Fifth Floor                       511 Union Street
Nashville, Tennessee  37219       Nashville, Tennessee  37219
ATTORNEY FOR ST. THOMAS HOSPITAL  ATTORNEY FOR LANGDON G. SMITH,M.D.
   and JACK T. SWAN, M.D.            and MILLER MEDICAL GROUP

C.J. GIDEON, JR.
Gideon & Wiseman
NationsBank Plaza
Suite 1900
Nashville, Tennessee  37219
ATTORNEY FOR HOSPITAL CORPORATION
   of AMERICA

REVERSED AND REMANDED

# O PINION

This is an appeal by plaintiff/appellant, Mary Alice Bolton Prince, from the decision of the trial court granting the motions for summary judgment of defendants/appellees. The trial court based its decision on its finding that Mrs. Prince was fifty percent or more at fault. The facts out of which this controversy arose are as follows.

## I.    Facts and Procedural History

On 20 June 1986, Mrs. Prince, a twenty-seven year-old woman, took an unknown number of pills at approximately 9:00 p.m. Mrs. Prince's husband, Russell Prince, called the Vanderbilt Poison Control Center. The center told Mr. Prince that the pills were a combination of caffeine and ephedrine and advised him to give Mrs. Prince ipecac to induce vomiting. Mr. Prince drove Mrs. Prince to a pharmacy where he purchased the ipecac. Without reading the instructions, Mr. Prince had Mrs. Prince drink the ipecac. Mrs. Prince began to vomit around 9:30 p.m. Mr. Prince estimated that there were a "half a dozen or so" pills in the vomitus. Mrs. Prince continued to vomit after the couple returned home. Mr. Prince decided to take Mrs. Prince to the nearest hospital, Hendersonville Hospital.

Hendersonville Hospital refused to admit Mrs. Prince because of her insurance so Mr. Prince took her to St. Thomas Hospital. Dr. Jack Swan attended to Mrs. Prince in the emergency room and took her and Mr. Prince's histories. Although it is unclear who told Dr. Swan, at some point, Dr. Swan was told that Mrs. Prince had taken between twenty and forty pills. Dr. Swan examined Mrs. Prince, but did not order an IV to replace lost fluids, antiemetics

2

to stop the vomiting, a drug screen, lab tests, a urinalysis, or a serum electrolyte. After his examination, Dr. Swan discharged Mrs. Prince and instructed Mr. Prince to drive her to Edgefield Hospital, a provider approved by Mrs. Prince's insurer.

Still vomiting, Mrs. Prince entered the Edgefield emergency room one hour after being admitted to the St. Thomas emergency room. Dr. Farrar examined Mrs. Prince and noted that she had a rapid heart beat with premature ventricular beats. He ordered numerous tests which revealed that Mrs. Prince's potassium level was dangerously low. Dr. Farrar contacted Dr. Langdon Smith to inform him of Mrs. Prince's condition, but did not tell him of the low levels of potassium. Dr. Farrar admitted Mrs. Prince to ICU and ordered that she receive ten milliequivalents of potassium per hour.

Dr. Smith conducted an examination of Mrs. Prince at 6:30 a.m. on 21 June 1986. He did not issue any new orders at that time. A second potassium check revealed that Mrs. Prince's potassium level was 2.4.[1] Dr. Smith returned at 7:30 a.m. and cut the third run of potassium in half. At approximately 11:49 a.m., Mrs. Prince suffered a cardiac arrest followed by a coma. As a result, she suffered permanent brain damage and recent memory loss.

On 19 February 1991, Mrs. Prince filed a complaint alleging medical malpractice and naming multiple defendants. The court entered an order dismissing numerous defendants on 2 October 1991. The remaining defendants were Hospital Corporation of America, Dr. Smith, Miller Medical Group, Dr. Farrar, St. Thomas Hospital, and Dr. Swan. All of the defendants filed motions for summary judgment. Mrs. Prince responded to the motions with three expert

---

[1] Normal potassium levels are between 3.5 and 4.5.

3

depositions.  On 30 November 1994, the court entered a preliminary order which overruled the motions, but which reserved the issue of whether Mrs. Prince's conduct constituted fifty percent or more of the fault in the case.

Defendants filed a joint memorandum renewing their summary judgment motions, and Mrs. Prince responded.  The parties orally argued the issue of fault on 9 February 1996.  The court held that Mrs. Prince's percentage of fault was fifty percent or more and granted summary judgment to defendants.  Thereafter, Mrs. Prince filed her notice of appeal.

## II.  Standard of Review

The sole issue on this appeal is whether the trial court erred in granting the defendant's motion for summary judgment.

> Tenn.R.Civ.P. 56.03 contains two requirements for granting a summary judgment.  First, there must be no genuine issue with regard to the material facts relevant to the claim or defense embodied in the motion.  Second, the moving party must be entitled to a judgment as a matter of law based on the undisputed facts.

*Pacific E. Corp. v. Gulf Life Holding Co.*, 902 S.W.2d 946, 952 (Tenn. App. 1995)(citations omitted).

> In determining whether or not a genuine issue of material fact exists for purposes of summary judgment, courts in this state have indicated that the question should be considered in the same manner as a motion for directed verdict made at the close of the plaintiff's proof, i.e., the trial court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. Then, if there is a dispute as to any material fact, or any doubt as to the conclusions to be drawn from that fact the motion must be denied.  The court is not to "weigh" the evidence when evaluating a motion for summary judgment.

*Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993)(citations omitted).

This court must use the same standard in reviewing a trial court's judgment granting summary judgment.

Our standard of review, and that of the trial court, on

4

> a motions for summary judgment is the same: we must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in their favor and discard all countervailing evidence. If we determine that a dispute exists as to any material fact or any doubt as to the conclusions to be drawn from that fact, we must deny the motion.

*Clifton v. Bass*, 908 S.W.2d 205, 208 (Tenn. App. 1995)(citations omitted).

## III. Disputed Factual Issues

The trial court found "that reasonable minds could not differ that Mary Alice Prince intentionally ingested a lethal dose of a toxic substance knowing that the ingestion created an unreasonable risk of harm." Our review of this record shows that the trial court's finding takes assumptions or inferences to be undisputed facts. We respectfully disagree.

### A. Number of Pills Taken

The trial court found as an undisputed fact that Mrs. Prince took a "lethal dose" of pills. The record, however, reveals that Mrs. Prince could have taken as many as twenty to forty pills or as few as six. Given the evidence, it is the opinion of this court that either inference is reasonable.

The relevant evidence included the following. Dr. Swan testified that he did not know whether Mrs. Prince had taken any pills. He also testified that he obtained a history from both Mr. and Mrs. Prince and that the estimate of twenty to forty pills could have come from either of them. Given Mrs. Prince's condition, it is reasonable to infer that Mr. Prince gave Dr. Swan the estimate. Mr. Prince, however, was not present when Mrs. Prince took the pills. The only thing Mrs. Prince told her husband

5

in reference to the quantity of pills was that she had taken some pills. Mr. Prince testified that he may have guessed at the numbers based on the number of pills he saw in the bathroom and the size of the bottle he found. When Mr. Prince entered the bathroom he found pills "in the toilet, in the sink, in the floor . . . all over the bathroom." In addition, Mr. Prince found a bottle in the trash which he estimated to be two and one-half inches high by one inch in diameter. It is reasonable to infer that with pills "in the toilet, in the sink, in the floor . . . all over the bathroom" the number actually taken was quite small. Also, Mr. Prince testified that there were only a "half a dozen or so" pills in Mrs. Prince's vomitus. Finally, Mr. Prince had threatened to leave home. Given such a threat, it is reasonable to infer that the act of taking the pills was a grandstand play intended to keep Mr. Prince from leaving, not an attempt to commit suicide. Thus, the evidence as to the number of pills taken is in dispute and is subject to numerous inferences.

### B. "Lethal Dose"

There is also a dispute as to whether the number of pills taken by Mrs. Prince was a lethal dose. Assuming that Mrs. Prince ingested twenty to forty pills, that the Vanderbilt Poison Control Center correctly identified the pills as Caphedrine, and that each pill contained 200 milligrams of caffeine, Mrs. Prince initially ingested four to eight grams of caffeine. The experts, however, do not agree as to whether this constitutes a lethal dose. Dr. Richard S. Crampton, Mrs. Prince's expert, testified that the lethal dose ranges from five to ten grams. In addition, Dr. Karl J. Crossen, defendants' expert, testified that there is no agreement as to the lethal dose. He testified as follows:

> Q. Do you know what the lethal dose of caffeine is?

6

> A. Depends on which text. I've seen it written down as approximately ten grams.

The possibility that the dose was lethal is even less when one considers that it is reasonable to conclude that Mrs. Prince took only six pills. To explain, six pills contain only 1.2 grams of caffeine. Thus, there is a dispute as to whether the number of pills taken by Mrs. Prince was a lethal dose, and assuming that she only took six pills, it is reasonable to infer that the dose was not lethal.

### C. Sequence of Events and Cause of Acute Event

There are other disputed factual issues related to the precipitating cause of Mrs. Prince's permanent injuries. With regard to the sequence of events at the time of Mrs. Prince's acute event, defendants have attempted to establish that Mrs. Prince suffered a seizure before going into ventricular fibrillation. They use this theory to support their argument that the amount of caffeine ingested was the primary agent in causing Mrs. Prince's injuries. Dr. George Klein and Dr. George Podgorny, Mrs. Prince's experts, both testified that the ventricular fibrillation preceded the seizure.

There is also a dispute as to the cause of the acute event. One theory, that of defendants, is that a caffeine overdose caused the cardiac arrest. Mrs. Prince's theory is that hypokalemia, low potassium, caused plaintiff's injuries. Both theories are supported by expert testimony. Dr. Crossen testified that a caffeine overdose without any secondary condition caused the cardiac arrest. Both Dr. Podgorny and Dr. Klein testified that the low potassium was the result of prolonged and copious vomiting. The prolonged vomiting resulted from Mr. Prince giving Mrs. Prince ipecac without water. We find nothing in the record to suggest

7

that ingestion of caffeine or caffeine with ephedrine caused the vomiting.

      **D.**     **Standard of Care**

Defendants also contend that because Mrs. Prince took the pills she was likely to have been injured whether defendants were negligent or not. Dr. Klein's testimony is clear, however, that if neither defendants nor Mr. Prince had acted after Mrs. Prince took the pills the caffeine would not have caused her injuries. Defendants take the position that once Mrs. Prince took the pills all that followed was inevitable. The record does not support this assertion without dispute.

There is a material question of whether the failure of the health care providers to properly deal with the consequences of the prolonged and copious vomiting caused Mrs. Prince's injuries. There is evidence that the defendants were negligent in their care of Mrs. Prince and that Mrs. Prince would not have sustained injuries had defendants complied with the standard of care. While at St. Thomas, despite a history of drug overdose and copious vomiting for a period of some four hours, Dr. Swan did not order an IV to replace lost fluids, did not order antiemetics to stop the vomiting, and did not order a drug screen or other lab tests such as a blood count, a urinalysis, or a serum electrolyte. There is evidence that the failure to order these tests or to order antiemetics deviated from the accepted standards of medical care. There is also evidence of a continued deviation from the acceptable standards of medical care after Mrs. Prince left St. Thomas and Mr. Prince took her to Edgefield Hospital.

      **E.**     **Proximate Cause and Apportionment of Fault**

8

In the order granting summary judgment the trial court referred to decisions of our supreme court. Specifically, the court relied on **Gray v. Ford Motor Company**, 914 S.W.2d 464 (Tenn. 1996), for the proposition that the principles of comparative fault apply to medical malpractice actions so that the fault of a patient can be compared to the fault of the treating health care providers. The first case in which the Tennessee Supreme Court approved the application of comparative fault principles in medical malpractice cases was **Volz v. Ledes**, 895 S.W.2d 677 (Tenn. 1995). In both **Gray** and **Volz**, the determination of apportionment of fault was left to the jury. **Gray**, 914 S.W.2d at 266; **Volz**, 895 S.W.2d at 677. We find no fault with the trial court's conclusion that principles of comparative fault are applicable in medical malpractice cases, but we are of the opinion that the trial court erred in making this comparison rather than having the jury do so. "In a jury case, the issues of negligence and proximate cause are generally for the jury. Such issues may be pre-empted by the Trial Judge only where the evidence and reasonable inferences therefrom are so free of conflict that all reasonable minds would agree with the decision of the Trial Judge." **Husted v. Echols**, 919 S.W.2d 43, 45 (Tenn. App. 1995). Such is not the case here.

The trial court in its judgment stated that "[i]n reaching this conclusion, the Court has carefully considered the factors that are relevant for determining the percentage of fault that should be assigned to a party . . . ." One of the relevant factors used when apportioning fault is "the relative closeness of the causal relationship between the conduct of the defendant and the injury to the plaintiff . . . ." **Eaton v. McLain**, 891 S.W.2d 587, 592 (Tenn. 1994). Here, there is a very real question of whether Mrs. Prince's act of taking an unknown quantity of pills was the proximate cause of her injuries. Mrs. Prince argues that the act

9

of making her take ipecac and the subsequent negligent treatment combined to intervene between Mrs. Prince's act of taking some pills and her final injuries. We do not think it is necessary to consider the case from the perspective of "intervening cause." The question is simple. Whose fault was more proximate? Most often, this is a question of fact to be determined by a jury. Based on the record and the reasonable inferences to be drawn therefrom, a jury could conclude that defendants' fault was more proximate to Mrs. Prince's injuries and that the act of Mrs. Prince was not proximate at all.

In the majority of cases, the *McIntyre v. Ballentine*, 833 S.W.2d 52 (Tenn. 1992), comparison and allocation of fault issues are properly left to the jury. The court in *Eaton* makes this clear:

> Under the pre-McIntyre fault system, the question for the, trial court on a motion for directed verdict/JNOV alleging contributory negligence was: if, after taking the strongest legitimate view of the evidence in the plaintiff's favor, could it be determined **beyond question** that the plaintiff was guilty **of <u>any</u>** negligence that proximately caused the resulting injuries? If the answer to this question was "yes," then a directed verdict was proper. This situation was rare, however, for as we emphasized in *Frady v. Smith*, 519 S.W.2d 584 (Tenn. 1974):
>
>> Negligence, contributory negligence, and proximate cause are ordinarily issues to be decided by the jury, and can be withdrawn from the jury and decided by the court only in those cases where the facts are established by evidence free from conflict, and the inference from the facts is so certain that all reasonable men, in the exercise of a free and impartial judgment, must agree upon it.
>
> This Court's adoption of the doctrine of comparative fault in McIntyre does not change these standards governing the trial court's assessment of the evidence; nor does it change the established standard governing the trial court's ultimate decision of whether to grant the motion. The trial court still must take the strongest legitimate view of the evidence in favor of the non-movant; and **it must grant the motion only if reasonable minds**

10

> **could not differ as to the legal conclusion to be drawn from that evidence.**

*Eaton*, 891 S.W.2d at 590(citations omitted)(bold emphasis added).

The defendants assert and the trial court found that "as a matter of law" Mrs. Prince's fault was at least fifty percent. In defendants' view, if the court determines that Mrs. Prince's act was intentional and that defendants' acts were negligent, the analysis comes to an end. That is, defendants contend the finding that one acted intentionally and the other negligently is sufficient for the court to render judgment as a matter of law in favor of the negligent party. We are of the opinion that a comparison of supposed levels of conduct without determining proximate cause is not presently the law in Tennessee. The asserted level of fault of a party is a circumstance for the finder of fact to consider when determining the percentage of fault of each party in producing the injury. It is not a bar to recovery.

## IV.    Conclusion

A review of the record reveals there are numerous material facts in dispute and that genuine doubt exists with regard to the conclusions and inferences to be drawn from the facts. Reasonable minds could conclude that Mrs. Prince did not intend to harm herself, that the pills she took would not have caused her harm, that her husband's act of making her take ipecac without water was the act which caused the need for medical care, and that Mrs. Prince would not have sustained any injuries had she received proper medical care.

Therefore, it results that the judgment of the trial court is reversed, and the case is remanded to the trial court for further necessary proceedings. Cost on appeal are taxed to

11

defendants/appellees.

_____
SAMUEL L. LEWIS, J.

CONCUR:

_____
HENRY F. TODD, P.J., M.S.

_____
WILLIAM C. KOCH, JR., J.