NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0049n.06
Filed: January 18, 2006

No. 04-5069

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| JEFFREY FEATHERS; APRIL FEATHERS, WIFE; | ) ) ) | |
| Plaintiffs-Appellants, | ) ) | |
| TRINITY UNIVERSAL INSURANCE COMPANIES, | ) ) ) | |
| Plaintiff, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE |
| v. | ) ) | EASTERN DISTRICT OF TENNESSEE |
| WILLAMETTE INDUSTRIES, INC.; BENCHMARK MECHANICAL CONTRACTORS, INC., | ) ) ) ) | |
| Defendants-Appellees. | ) | |

BEFORE: SILER, CLAY, and ROGERS, Circuit Judges.

**ROGERS, Circuit Judge.** While working as a foreman for defendant Benchmark
Mechanical Contractors, Inc., a construction contractor at the paper plant of defendant Willamette
Industries, Inc., plaintiff Jeffrey Feathers directed the use of equipment in a way that caused his leg
to be crushed. Willamette banned Feathers from its plant for safety reasons, and Benchmark
subsequently laid Feathers off. Feathers and his wife, April, brought an action asserting five claims:
(1) retaliatory discharge against Benchmark; (2) conspiracy to engage in retaliatory discharge

against Benchmark and Willamette; (3) premises liability against Willamette; (4) tortious interference with an employment contract against Willamette; and (5) a claim by April Feathers for loss of consortium. The district court granted summary judgment in favor of both defendants, holding that Feathers had failed to present evidence raising a genuine issue of material fact as to any of his claims. We affirm.

## I. Background

Willamette Industries, Inc., (Willamette) produces paper products.[1] Benchmark Mechanical Contractors, Inc., (Benchmark) entered into a contract with Willamette to provide construction services at Willamette's facility in Kingsport, Tennessee. Benchmark employed Feathers as a general foreman on the Kingsport construction site. As a general foreman, Feathers supervised a crew of Benchmark laborers.

On Saturday, March 17, 2001, Feathers and three members of his crew were fabricating and erecting structural steel-pipe supports in Willamette's bleach plant. Directly across from the bleach plant was a pulp mill, and between the bleach plant and pulp mill were three railcars sitting on a railroad track. Feathers and his crew needed to move a lift from the pulp mill through an access door in the bleach plant to a courtyard. It was important that the crew get the lift into place on that Saturday so that it would be ready for a larger crew to use on the following Monday. If the lift was

---

[1]In February 2002, the assets and liabilities of Willamette were purchased by Weyerhaeuser Corporation. All parties have agreed, for purposes of this appeal, to treat Willamette and Weyerhaeuser interchangeably and to refer to this defendant as "Willamette."

not in the courtyard by Monday morning, it could have delayed the larger crew's work because the increased weekday rail traffic between the bleach plant and pulp mill could impede the lift from being moved.

The railcars between the buildings, however, blocked entry through the access door. Thus, one of the railcars needed to be moved. Feathers claims that he received permission to move the car and that it was common for Benchmark employees to move railcars. He further claims that Willamette personnel were aware that Benchmark employees moved railcars. Feathers admits that he never requested assistance from either Benchmark or Willamette in moving the railcar, but he claims that, because it was Saturday, there were no Willamette crews available. Willamette crews usually moved railcars with a piece of equipment called a "payloader."

Feathers first attempted to push the railcar with a single forklift. The forklift failed to move the railcar because the ground was wet and the tires on the forklift lost traction on the rails and wet asphalt.

When the first attempt proved unsuccessful, Feathers ordered one of his crew to get a second forklift. Feathers positioned the two forklifts parallel to each other facing the back of the railcar. He secured one end of a steel cable to a forklift, ran the cable around the railcar's coupling, and secured the other end of the cable to the other forklift. Feathers then ordered the two forklifts to pull backwards on the cable to pull the railcar. According to Feathers, he walked between one of the forklifts and a loading dock and next to the railcar as the railcar began to roll. Although the parties

provide different explanations regarding what took place next, it is undisputed that one of the forklifts lost traction and slid towards Feathers. Feathers attempted to jump up on the railcar to avoid being hit, but he was unable to pull himself up fast enough. The mast of the forklift crushed Feathers's leg as it collided with the rear of the railcar.

The next day, representatives from Benchmark and Willamette met to investigate the accident. The representatives memorialized the meeting in a report entitled "Accident Investigation and Contractor Review for Benchmark Services" (Accident Report). The Accident Report provided the representatives' findings regarding the circumstances of the accident and set forth nine steps to improve safety at the Kingsport facility. The first step provided that "Benchmark would not bring Jeff Feathers to the Willamette, Kingsport Site anymore. Jeff has had previous safety issues . . . . This incident shows a lack of safety commitment to Willamette, his crew and Benchmark."[2] J.A. at 255. Four days later, Benchmark management, in a letter to Willamette, confirmed that Feathers was banned from the Kingsport facility.

Feathers spent four months recovering from his injury. When Feathers returned to work on July 25, 2001, Dale Jett, a Benchmark Construction Manager, informed him that he had been banned

---

[2]The Accident Report's statement regarding "previous safety issues" refers to an earlier incident involving Feathers at the Kingsport facility. In October 1999, John Redmon, a contractor working for Willamette, observed Feathers's crew using a ladder that was not tied off. When Redmon asked Feathers to tie off the ladder, Feathers argued that tying off the ladder would increase the risk to his crew because the ladder might need to be moved quickly in the event of an emergency. Feathers refused to tie down the ladder. For his refusal to follow Redmon's orders, Feathers was laid off by Benchmark until the spring of 2000.

from the Willamette Kingsport facility. Because Benchmark had no other work available, Feathers was laid off. Jett told Feathers that he could review a list of upcoming projects at other facilities and determine whether he was interested in working on any of those projects. Feathers, however, declined the work because those jobs required him to travel to out-of-town locations.

Feathers filed a claim for workers' compensation benefits for his injury. The record does not indicate when he filed his claim. Feathers obtained workers' compensation benefits by an order entered March 6, 2002.

On March 15, 2002, Feathers filed a four-count complaint in the Law Court for Sullivan County alleging (1) Benchmark discharged him in retaliation for filing a workers' compensation claim, (2) Benchmark and Willamette conspired in the retaliatory discharge, (3) Willamette tortiously interfered with the employment contract between Feathers and Benchmark in violation of § 47-50-109 of the Tennessee Code, and (4) Willamette negligently failed to provide a safe working environment. Feathers amended his complaint on March 19, 2002, to add his wife, April Feathers, as a plaintiff. The amended complaint sought damages for April Feathers's loss of her husband's "services, companionship, consortium and society" due to his injury. Based on diversity of citizenship, Willamette removed the case to the federal district court below.

Both Benchmark and Willamette filed motions for summary judgment. Benchmark asserted in its motion that Feathers had failed to produce any evidence that it laid off Feathers in retaliation for filing a workers' compensation claim. Benchmark also asserted that Feathers's claim of

conspiracy failed because (1) Benchmark and Willamette did not work together to terminate Feathers and (2) Feathers cannot prove a prima facie case for the underlying claim of retaliatory discharge. Willamette asserted in its motion that (1) Feathers had failed to produce evidence that Willamette tortiously interfered with any contract of employment because, among other things, there was no contract between Feathers and Willamette, (2) Feathers's claim of premises liability must fail because Feathers cannot show that Willamette breached any duty, and (3) April Feathers's claim failed because it was derivative of her husband's failed claims.

The district court granted both defendants' motions for summary judgment. The court first ruled that Feathers was an at-will employee. As an at-will employee, Feathers did not have a contract with Benchmark; consequently, it was impossible for Willamette to interfere with any contract between Feathers and Willamette. The court acknowledged that, in some circumstances, a third party may be liable to an at-will employee for interfering with the employment relationship. But because Feathers had failed to produce any evidence that Willamette banned Feathers to force Benchmark to terminate him, the court held that the claim for tortious interference failed. Second, the court held that Feathers's retaliatory discharge claims failed because he produced no evidence that Benchmark terminated him in retaliation for filing a workers' compensation claim. Third, the court held that no genuine issue of material fact existed regarding Feathers's premises liability claim, because Feathers caused the dangerous condition by moving the railcar. Because Feathers's claims failed, the district court held that April Feathers's derivative suit likewise failed. The Featherses filed a timely notice of appeal.

Benchmark subsequently filed a voluntary bankruptcy petition in the United States Bankruptcy Court for the Eastern District of Tennessee. Because Benchmark is subject to a stay pursuant to 11 U.S.C. § 362 of the Bankruptcy Code, the Featherses' appeal is stayed as to Benchmark. *See Vogel v. U.S. Office Prods. Co.*, 258 F.3d 509, 513-14 (6th Cir. 2001). This court thus will only address the Featherses' claims against Willamette.

### III. Analysis

This court reviews a district court's grant of summary judgment de novo. *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The facts, as well as any inferences that can be drawn from them, must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether a factual issue is genuine in most civil cases, a court must decide "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### A.     Conspiracy to Engage in Retaliatory Discharge

Feathers's claim against Willamette for conspiracy to engage in retaliatory discharge fails because he presents no evidence that Willamette conspired with Benchmark to discharge him for

filing for workers' compensation benefits. Feathers argues that the following items demonstrate the existence of a conspiracy between Benchmark and Willamette: (1) the safety meeting held by Benchmark and Willamette on March 18, 2001, (2) the subsequent letters stating that Feathers was banned from the work site, and (3) and the "close knit" relationship between Feathers and Benchmark. These interactions between Benchmark and Willamette, however, do not support the existence of an agreement "'between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means.'" *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 67 (Tenn. 2001) (quoting *Chenault v. Walker*, 36 S.W.3d 45, 52 (Tenn. 2001)). Instead, they merely show the normal relations between two companies engaged in a business relationship. When there is a serious accident involving a contractor's employee on the premises of another company, it is reasonable for the two companies to meet, investigate the accident, and take appropriate remedial action.

Even if Feathers did produce evidence that Willamette engaged in a conspiracy, his claim must fail because he has not raised any issue of material fact as to his claim that Benchmark terminated him for seeking workers' compensation benefits. "It is a general rule that a conspiracy cannot be made the subject of a civil action, unless something is done which, without the conspiracy, would give a right of action. The damage done is the gist of the action, not the conspiracy." *Greene v. Brown & Williamson Tobacco Corp.*, 72 F. Supp. 2d 882, 887 (W.D. Tenn. 1999) (quoting *Tenn. Pub. Co. v. Fitzhugh*, 52 S.W.2d 157, 158 (Tenn. 1932)). Thus, unlike under criminal conspiracy,

"if the claim underlying the allegation of civil conspiracy fails, the conspiracy claim must also fail."

*Levy v. Franks*, 159 S.W.3d 66, 82 (Tenn. Ct. App. 2004).

In this case, Feathers's underlying claim against Benchmark fails because he has not satisfied his burden to establish a prima facie case of retaliatory discharge. To establish a prima facie case, Feathers must provide evidence establishing the following elements:

> (1) [t]he plaintiff was an employee of the defendant at the time of the injury;
>
> (2) the plaintiff made a claim against the defendant for workers' compensation benefits;
>
> (3) the defendant terminated the plaintiff's employment; and
>
> (4) the claim for workers' compensation benefits was a substantial factor in the employer's motivation to terminate the employee's employment.

*Anderson v. Standard Register Co.*, 857 S.W.2d 555, 558 (Tenn. 1993). Feathers has shown that he was an employee of Benchmark at the time of his injury, that he made a claim against Benchmark for workers' compensation benefits, and that Benchmark terminated his employment. The first three elements of his retaliatory discharge claim are thus satisfied.

Feathers has not, however, produced any evidence that his workers' compensation claim was a substantial factor in Benchmark's decision to terminate his employment. In support of his claim for retaliatory discharge, Feathers points to two pieces of evidence. First, he argues that "a nexus exists between the occurrence of the compensable injury sustained by Feathers and the timing of his being banned from . . . Willamette's premises. The timing of his termination by Benchmark after returning to work with no restrictions on his activities is also noteworthy . . . ." On this point,

Feathers analogizes his case to *Sasser v. Averett Express, Inc.*, 839 S.W.2d 422 (Tenn. Ct. App. 1992). In *Sasser*, a truck driver was discharged within hours after settling his workers' compensation claim for three times more than the workers' compensation carrier originally offered. 839 S.W.2d at 427. The court held that material evidence supported the jury's verdict that the employer discharged the driver in retaliation for his workers' compensation claim. *Id.* In addition to the timing of the discharge, the court noted that the manager who terminated the driver had previously called the driver a "two-face liar" and a "back stabber" when he learned of the suit and that the employer's witnesses' testimony at trial regarding witnesses' reasons for discharging the driver differed from their testimony during discovery. *Id.*

The present case is distinguishable from *Sasser*. Unlike in *Sasser*, Feathers does not allege that Benchmark management expressed displeasure upon learning of his workers' compensation claim. Nor does he allege that Benchmark employees changed their reasons for discharging him. Most importantly, the timing of Feathers's termination is completely different from that in *Sasser* because it raises no inference that he was terminated for filing a workers' compensation claim. Feathers was not immediately discharged after Benchmark learned of a large workers' compensation award. On the contrary, he was only terminated after Willamette—within its rights—banned him from the Kingsport facility[3] and, four months later, he turned down other work because the locations

---

[3]The contract between Benchmark and Willamette provides that "safety requirements will be strictly enforced and that continued disregard of these and other applicable safety rules and regulations by the Contractors' employees will result in a request that such employees be removed from the construction site." J.A. at 279.

were out-of-town. Feathers does not explain how Benchmark could have continued employing him when he was banned from the Kingsport site and when he rejected Benchmark's other projects.

Feathers also tries to establish a causal link between his claim for workers' compensation and his termination by arguing that the accident was not his fault and that Willamette's subsequent investigation was "flawed." This argument fails, however, because the accuracy of the investigation and Feathers's culpability in the accident are irrelevant to his claim. As the district court stated,

> [T]he issue is not whether Willamette was wrong or right, or justified or unjustified, in concluding that Mr. Feathers was cavalier regarding matters of safety. Nor is it of any relevance whether Willamette's investigation was flawed, or whether it reached the right or wrong conclusions concerning the cause of the accident.

Any actions by Willamette are irrelevant to Feathers's retaliatory discharge claim against Benchmark because Willamette did not terminate Feathers. Instead, the issue is whether *Benchmark* terminated Feathers in retaliation for filing a workers' compensation claim. As previously stated, Benchmark terminated Feathers only after he rejected the work it offered.

Feathers thus presents no evidence that his claim for workers' compensation benefits was a factor in causing his discharge. "[I]n order to get to the jury, there must be some proof of causation other than the facts showing employment, the exercise of rights under the workers' compensation act, and a subsequent discharge." *Thomason v. Better-Bilt Aluminum Prods., Inc.*, 831 S.W.2d 291, 293 (Tenn. Ct. App. 1992). Because Feathers fails to raise any genuine issues of

material fact as to his retaliatory discharge claim against Benchmark, no genuine issue of material fact exists as to Feathers's conspiracy claim against Willamette.

**B.      Tortious Interference**

No genuine issues of material fact exist as to Feathers's claim that Willamette tortiously interfered with his employment contract because Feathers has not presented any evidence that Willamette maliciously intended for him to be terminated. Both parties devote much argument to the issue of whether Feathers was an at-will employee. If Feathers was an at-will employee, there can be no contract with which Willamette tortiously interfered. However, whether Feathers's employment was at-will is not controlling for two reasons. First, the Tennessee Supreme Court has recognized a claim for tortious interference with at-will employment, *see Forrester v. Stockstill*, 869 S.W.2d 328, 330 (Tenn. 1994), so that at-will employee status does not ipso facto prelude a claim for intentional interference with an employment relationship. Second, Feathers's claim fails regardless of whether his employment was at-will because he cannot demonstrate that Willamette maliciously intended for him to be terminated.

Section 47-50-109 of the Tennessee Code provides,

> It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages.

Tenn. Code Ann. § 47-50-109 (West 2005). To recover for procurement of a breach of contract under § 47-50-109, Feathers must show "that there was a legal contract, of which the wrongdoer was aware, that *he maliciously intended to induce a breach*, and there must have been a breach, proximately caused by his acts, resulting in damages." *Polk & Sullivan, Inc. v. United Cities Gas Co.*, 783 S.W.2d 538, 543 (Tenn. 1989) (emphasis added).

Feathers offers only one piece of evidence that Willamette maliciously intended his termination. He states that "Oscar Harris, Benchmark's Safety Director, confirmed Willamette personnel were especially mad at Feathers over the Redmon incident" that took place in October 1999. This refers to a statement Harris made during his deposition. In response to the question whether people at Willamette were "especially mad" at Feathers after the Redmon incident, Harris stated, "I'm going to have to say yes, or they would have never asked him to leave the job site." J.A. at 491-92.

This statement does not lead to the inference that Willamette banned Feathers with the intention that Feathers be terminated. It merely describes the feelings of Willamette employees towards Feathers after the Redmon incident in October 1999. *See supra* note 2. It is reasonable that Willamette employees would be angry with Feathers after he committed a safety violation and refused to remedy that violation when asked. Moreover, how Willamette employees felt towards Feathers in October 1999 has little bearing on how they felt towards him *sixteen months later* when Willamette banned him from the Kingsport facility.

That Willamette banned Feathers from its work site also does not lead to the inference that it was acting maliciously. Willamette was acting within its rights when it banned Feathers after it found that Feathers had committed his second safety violation. The contract between Benchmark and Willamette provides that "safety requirements will be strictly enforced and that continued disregard of these and other applicable safety rules and regulations by the Contractors' employees will result in a request that such employees be removed from the construction site." Because Willamette was acting within its discretion under its contract with Benchmark when it banned Feathers, as a matter of law, it did not tortiously interfere with Feathers's employment. For instance, we held in *Purisch v. Tenn. Technological Univ.*, 76 F.3d 1414, 1420 (6th Cir. 1996), that it was appropriate to grant summary judgment against a plaintiff on his tortious interference claim in part because the university's tenure committee, in denying plaintiff tenure, was acting within its discretion.

## C.      Premises Liability

No genuine issues of material fact exist as to Feathers's premises-liability claim because Willamette did not have a duty to prevent Feathers's accident. To recover in a negligence action, a plaintiff has the burden of proving (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care which amounts to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal, causation. *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000). In a premises-liability case, the owner of the land

generally has a duty to use reasonable care to provide a safe place in which an independent contractor and his employees can work. *Hutchison v. Teeter*, 687 S.W.2d 286, 288 (Tenn. 1985).

Feathers argues that Willamette breached its duty of care by leaving the railcars between the bleach plant and the pulp mill. By leaving the railcars in a place where they blocked his work, Feathers argues, Willamette created an "unreasonably hazardous condition." Feathers argues that this hazardous condition was the direct and proximate cause of his accident and injuries. He suggests that the accident was the fault of Willamette because (1) he had to move the lift on that Saturday because, if he waited until Monday, the volume of railcar traffic would preclude moving it; (2) no Willamette employees were available to move the lift because it was Saturday; and (3) Willamette gave him permission to move the lift. Feathers attributes all fault in the accident to Willamette and the forklift drivers; regarding his own actions, Feathers argues that he conducted himself "in a safe, reasonable and workmanlike manner."

Under these facts, however, no duty arose in this case because any danger in moving a railcar is obvious. The duty of "landowners to provide a reasonably safe workplace . . . is limited to a duty of the owner to warn of *latent* defects. *Inman* clearly holds that an owner is not subject to liability for failure to warn or protect the employee of an independent contractor against obvious, apparent, or known dangers." *Ellis v. Chase Commc'ns, Inc.*, 63 F.3d 473, 476 (6th Cir. 1995) (emphasis in the original) (citing *Inman v. Aluminum Co. of Am.*, 697 S.W.2d 350, 353 (Tenn. Ct. App. 1985)). This case does not involve a hidden danger, such as a buried gas line, *see Hutchison*, 687 S.W.2d at 287, or rotten wood in a roof which causes it to collapse, *see Blair v. Campbell*, 924 S.W.2d 75,

76 (Tenn. 1996). It should have been obvious to Feathers that it is dangerous to attach a steel cable to two forklifts, use the cable to pull a railcar, and walk near the railcar as it is being pulled. Feathers created the "unreasonably dangerous condition" by attempting to move the railcar in this manner.

Morevoer, Willamette had no duty to prevent the accident because the accident was not foreseeable. "If the injury which occurred could not have been reasonably foreseen, the duty of care does not arise, and even though the act of the defendant in fact caused the injury, there is no negligence and no liability." *Eaton v. McLain*, 891 S.W.2d 587, 594 (Tenn. 1994). In other words, Feathers must make "a showing from which it can be said that the defendants reasonably knew or should have known of the probability of the occurrence such as the one which caused [his] injuries." *Doe v. Linder Constr. Co.*, 845 S.W.2d 173, 178 (Tenn. 1992).

Feathers has made no such showing in this case. For Willamette to be charged with the duty to make sure that its railcars were not blocking the work of Benchmark laborers, Willamette must have been able to foresee that Feathers would take two forklifts, attach a steel cable to each forklift, and use the cable to pull a railcar. Willamette must further have been able to foresee that, while pulling a railcar in this manner, Feathers would walk close enough to a forklift and the railcar that he would be injured when the forklift lost traction on wet ground and slid into the railcar. Feathers's conduct is so ill-conceived that Willamette could not have reasonably foreseen that it would occur. When Willamette gave Feathers permission to move the railcar, it surely did not expect him to move it in such a dangerous manner.

Feathers argues that, even if he is partially at fault, the negligence issue in this case is governed by the doctrine of comparative fault and thus is a matter for the jury. This argument is without merit. Duty is a requirement for negligence liability in Tennessee even after the adoption of comparative negligence. There must be fault before fault can be compared or apportioned. *See Eaton*, 891 S.W.2d at 593-94. Because Willamette was under no duty to prevent or warn Feathers of the danger posed by the railcar, there is no genuine issue of material fact as to Feathers's premises-liability claim against Willamette.

**D.      Loss of Services, Companionship, Consortium and Society**

Because no genuine issues of material fact exist as to any of Feathers's claims, April Feathers's derivative claim of loss of services, companionship, consortium and society similarly fails. *See Tuggle v. Allright Parking Sys., Inc.*, 922 S.W.2d 105, 109 (Tenn. 1996).

**IV.  Conclusion**

For the foregoing reasons, this court AFFIRMS the judgment of the district court.

**Clay, Circuit Judge**, concurring in part and dissenting in part. I concur with the majority's decision with respect to Plaintiff's claims of retaliatory discharge, conspiracy to commit retaliatory discharge, and inducement of breach of contract. I cannot agree, however, with the majority's holding that summary judgment was appropriate for Plaintiff's claim of premises liability. Likewise, Plaintiff's wife's derivative claim of loss of consortium should have survived summary judgment. Under Tennessee law, Defendant Willamette owed a duty of care to Plaintiff to make the paper mill safe, even with the open and obvious nature of the danger in moving rail cars. Moreover, Defendant Willamette could have reasonably foreseen Plaintiff's injuries, even if it could not have reasonably foreseen the exact manner in which those injuries occurred. Plaintiff has thus set forth sufficient evidence to entitle him to a jury trial on this claim.

I reiterate that the standard of review of a district court's grant of summary judgment is *de novo*. A district court must grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must view any facts and inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). With this standard in mind, I turn to the Tennessee law of premises liability.

Under Tennessee common law, a claim of negligence requires Plaintiff to prove: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that

amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995) (citations omitted).

### A.    Duty of Care

Whether a duty of care exists is a question of law to be determined by the courts. *Burroughs v. Magee*, 118 S.W.3d 323, 327 (Tenn. 2003). The parties agree that Plaintiff was an invitee employee of an independent contractor on Defendant Willamette's property at the time of the accident. Defendant owed Plaintiff a duty to use reasonable due care in providing a safe place to work. *Hutchison v. Teeter*, 687 S.W.2d 286, 288 (Tenn. 1985) (citation omitted). This duty required Defendant Willamette to remove or warn Plaintiff about any hidden or latent dangers on the property. *Eaton v. McLain*, 891 S.W.2d 587, 595 (Tenn. 1994) (citations omitted). Plaintiff must show that Defendant Willamette either created these kinds of dangerous conditions, or it had actual or constructive notice of these kinds of dangerous conditions. *Martin v. Washmaster Auto Ctr., USA*, 946 S.W.2d 314, 318 (Tenn. App. Ct. 1996).

As the majority points out, Defendant Willamette did not have a general duty to warn Plaintiff about open and obvious dangers. *Eaton*, 891 S.W.2d at 595 (citations omitted). Contrary to the majority's belief, however, the inquiry does not end if a danger is open and obvious; with such a danger, "if the forseeability and gravity of harm . . . outweighed the burden on the defendant to engage in alternative conduct to avoid the harm, there is a duty to act with reasonable care." *Coln*

*v. City of Savannah*, 966 S.W.2d 34, 43 (Tenn. 1998), *overruled on other grounds by Cross v. City*

*of Memphis*, 20 S.W.3d 642 (Tenn. 2000).

I agree with the district court that there is nothing dangerous about a rail car, in and of itself; the danger is in moving the rail car. I disagree, however, with the district court's assessment that the danger was created by Plaintiff. The evidence shows that Plaintiff and other employees of Defendant Benchmark were required to regularly move railway cars in order to have access to work sites. It is no answer to say that Defendant Willamette and Defendant Benchmark did not order Plaintiff to move the rail car that day; any number of Plaintiff's everyday actions as general foreman would not require such direct orders. Moreover, the fact that Plaintiff chose the specific method of moving the rail car does not address whether there is a general danger in moving rail cars; instead, Plaintiff's method of moving the rail car would speak to his contributory negligence.

The act of moving a large hunk of metal such as a rail car, regardless of the method, is inherently dangerous. The dangerous condition, the moving of rail cars, was created by Defendant Willamette.[1] Defendant Willamette controlled the premises in this case, and it used these rail cars for transportation of materials at the premises; however, these rail cars were regularly left in

---

[1]I agree with Plaintiff that *Johnson v. EMPE, Inc.*, 837 S.W.2d 62, 65 (Tenn. App. Ct. 1992), is inapposite. That case stood for the proposition that when an independent contractor has exclusive control over a particular piece of property, the duty of care belongs to the independent contractor and not to the owner of the property. In this case, Defendant Benchmark had no such exclusive control over the rail cars.

positions which required employees, of either Defendant Willamette or Defendant Benchmark, to move the cars in order to go about their everyday work.

Even though the movement of rail cars is dangerous, it is an open and obvious danger. There is nothing hidden or latent about using great force to move a large and heavy metal object. The question then becomes whether, under *Coln*, "the forseeability and gravity of harm . . . outweighed the burden on the defendant to engage in alternative conduct to avoid the harm." 966 S.W.2d at 43. In this case, Defendant Willamette did have a duty to use reasonable care to protect Plaintiff in connection with the open and obvious danger of the moving of rail cars. The danger was foreseeable; Defendant Willamette knew Plaintiff was moving a rail car that day, and it knew that Plaintiff moved rail cars in the past with small equipment such as fork lifts. The danger was grave; a moving rail car could easily cause serious bodily injury and even death.

In terms of alternative conduct on the part of Defendant Willamette, it could have disallowed the practice of moving rail cars with fork lifts; it could have required a payloader be used; it could have required Willamette supervision; it could have required a full crew be used. In other words, there was a multitude of actions Defendant Willamette could have utilized to minimize the danger on the premises that also would not have been prohibitive in terms of cost.

Under the reasoning of *Coln*, Defendant Willamette owed Plaintiff a duty of reasonable care to protect Plaintiff from the danger of moving rail cars because the foreseeability and gravity of the harm outweighed any burden on Defendant Willamette to engage in alternative conduct. Even

assuming Plaintiff chose the most dangerous and haphazard way possible to move the rail car, this fact did not eliminate Defendant Willamette's duty to use reasonable care in assuring that its premises was not unnecessarily hazardous in connection with this dangerous condition.

### B.    Breach of Duty of Care

Having established a duty of care, the jury must find whether Defendant Willamette breached such duty; in other words, breach of duty is ordinarily a jury question. *Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 56 (Tenn. 2004). "However, even [this] question[ ] may be decided at the summary judgment stage if the evidence is uncontroverted and if the facts and the inferences drawn reasonably from the facts permit reasonable persons to draw only one conclusion." *Rains v. Bend of the River*, 124 S.W.3d 580, 588 (Tenn. App. Ct. 2003).

Plaintiff has raised a genuine issue of material fact as to breach of duty. Plaintiff's underlying claim is that Defendant Willamette did not have sufficient crews or machinery available at the paper mill to safely move rail cars, nor did it allow Defendant Benchmark to maintain sufficient personnel to safely move the rail cars. This claim is supported by evidence. Plaintiff stated that Defendant Willamette liked contracting work with Defendant Benchmark because it used a minimum number of people and a minimum amount of equipment. Plaintiff stated that Defendant Willamette used to have a crew of people specifically to move rail cars, but in order to cut costs, Defendant Willamette did away with the crew. Plaintiff stated that to save costs and man hours, Plaintiff had moved rail cars in the past with "Bobcats" and fork lifts.

Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has sufficiently raised the issue of Defendant Willamette's breach of duty. The evidence shows that Defendant Willamette was cost-conscious, and this affected the workers' safety in moving rail cars. In addition, a reasonable inference can be drawn that Defendant Willamette knew employees of Defendant Benchmark were moving rail cars with fork lifts, and Defendant Willamette approved of such action because it saved money and time. In short, a genuine issue of material fact exists as to whether Defendant Willamette compromised the safety of the premises in order to conserve resources.

### C.    Injury or Loss

Defendant Willamette concedes Plaintiff suffered injury as a result of the events of March 17, 2001.

### D.    Cause in Fact

The issue of whether Defendant Willamette's breach was a cause in fact of Plaintiff's injury is ordinarily a jury question. *Lourcey*, 146 S.W.3d at 56. Plaintiff, however, still needs to raise a genuine issue of material fact with respect to this issue. *Rains*, 124 S.W.3d at 588.

Plaintiff has raised sufficient evidence as to cause in fact. For example, the evidence shows that Defendant Willamette once employed a crew specifically to move rail cars but eliminated the crew to cut costs. If this is true, then but for Defendant Willamette's actions, Plaintiff may not have

been injured. The crew would have moved the rail car on March 17, 2001, not Plaintiff. As a result,

Plaintiff in all likelihood would not have been injured.

### E. Proximate Cause

"Proximate causation is a jury question unless the uncontroverted facts and inferences to be

drawn from them make it so clear that all reasonable persons must agree on the proper outcome."

*Roe v. Catholic Diocese of Memphis, Inc.*, 950 S.W.2d 27, 31 (Tenn. App. Ct. 1996).

Under Tennessee common law, Plaintiff must prove three elements to prove proximate

cause:

> (1) the tortfeasor's conduct must have been a "substantial factor" in bringing about
> the harm being complained of; and (2) there is no rule or policy that should relieve
> the wrongdoer from liability because of the manner in which the negligence has
> resulted in the harm; and (3) the harm giving rise to the action could have reasonably
> been foreseen or anticipated by a person of ordinary intelligence and prudence.

*McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991). Plaintiff has raised sufficient evidence

for all three elements.

Defendant Willamette's alleged breach was a substantial factor in bringing about Plaintiff's

injury. Plaintiff's evidence indicates that Defendant Willamette "cut corners" in terms of moving

rail cars, and the evidence implies that Defendant Willamette approved of cost-saving measures such

as using a fork lift to move a rail car.

No policy justification exists that should relieve Defendant Willamette from liability. The district court found and Defendant Willamette believes that Defendant Willamette should not be held responsible for Plaintiff's "own absurd and negligent acts." (Def.'s Br. 47.) This assertion goes not to proximate cause but to contributory negligence. Again, even if Plaintiff chose the most dangerous way to move the rail car, this does not mean a breach of duty by Defendant Willamette could not be a proximate cause of Plaintiff's injury. For example, if Defendant Willamette condoned or encouraged Plaintiff's "absurd and negligent acts" because of cost considerations, then Defendant Willamette's breach of duty would be a proximate cause of injury.

Defendant Willamette should have foreseen the injury caused by its alleged breach of duty. The evidence shows Plaintiff moved rail cars regularly at the paper mill. He sometimes moved them with small equipment, such as a fork lift. A reasonable inference is that Defendant Willamette was aware of this method of moving rail cars. As a result, Defendant Willamette was on notice that rail cars were being moved in an unsafe manner on the premises.

The majority asserts that Defendant Willamette could not have foreseen the exact manner in which Plaintiff's injuries occurred, *i.e.*, it could not have foreseen that Plaintiff was going to use two fork lifts and a cable to pull the rail car, and that Plaintiff would be injured when one of the fork lifts lost traction on the wet ground. Assuming *arguendo* the truth of this statement, Plaintiff may still establish proximate cause. In order to prove proximate cause, Plaintiff needs to demonstrate that "*the harm giving rise to the action* could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence." *McClenahan*, 806 S.W.2d at 775. Thus the harm,

not the exact manner in which the harm occurred, must be foreseeable. The Tennessee Supreme

Court has specifically rejected the reasoning of the majority:

> The foreseeability requirement is not so strict as to require the tortfeasor to foresee the exact manner in which the injury takes place, provided it is determined that the tortfeasor could foresee, or through the exercise of reasonable diligence should have foreseen, the general manner in which the injury or loss occurred. . . . The fact that an accident may be freakish does not per se make it unpredictable or unforeseen. . . . It is sufficient that harm in the abstract could reasonably be foreseen.

*Id.* (internal quotations and citations omitted). In the instant case, Defendant Willamette could have

reasonably foreseen the "harm in the abstract" from the moving of rail cars with fork lifts. In the

most favorable light, the evidence demonstrates that Defendant Willamette knew Plaintiff used fork

lifts to move rail cars on the premises, and that Defendant Willamette approved of the practice to

save time and money. It does not take a fertile imagination to realize the harm that can befall a

person when moving large rail cars with small equipment.

In sum, this is not a situation where "the uncontroverted facts and inferences to be drawn

from them make it so clear that all reasonable persons must agree on the proper outcome." *Catholic

Diocese of Memphis, Inc.*, 950 S.W.2d at 31. A jury should decide whether Defendant Willamette's

conduct was a proximate cause of Plaintiff's injury.

## F. Comparative Fault

Tennessee courts have adopted a regime of modified comparative fault. *McIntyre v. Balentine*, 833 S.W.2d 52, 57 (Tenn. 1992). Under this system, Plaintiff may recover, even if he was negligent, if his fault was less than Defendant Willamette.[2] *Id.*

Comparative fault is ordinarily an issue left to the jury. *Prince v. St. Thomas Hosp.*, 945 S.W.2d 731, 735 (Tenn. App. Ct. 1996). Summary judgment, however, is appropriate "[i]f the evidence is evaluated in the light most favorable to the plaintiff and reasonable minds could not differ that [his] fault was equal to or great than that of the defendant[ ]." *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 91-92 (Tenn. 2000).

Here, reasonable minds could differ as to whether Plaintiff's fault was equal to or greater than Defendant Willamette's fault. There is certainly undisputed evidence that Plaintiff was at fault. Plaintiff stood next to the right fork lift, placing himself in immediate danger, even though he could have safely stood on the loading dock and directed the fork lift operators. Plaintiff did not ask for additional equipment, nor did he ask for extra man power. (On the other hand, no evidence suggests that additional equipment or workers would have been available had Plaintiff made such requests.)

Plaintiff's evidence does suggest fault on Defendant Willamette's part. In the most favorable light, the evidence suggests that Defendant Willamette had cut costs in connection with moving rail cars on the premises. As a direct result, the safety of such action was reduced. Defendant Willamette knew that Plaintiff was moving rail cars with fork lifts. The reasonable inference is that

---

[2]This is also known as the "49 percent rule."

Defendant Willamette permitted such action because it cost less than using a payloader or other heavy equipment to move the rail car. In other words, Defendant Willamette traded the safety on the premises for an increase in the profit margin.

The evidence suggests that Plaintiff may have been negligent when he used two fork lifts and a cable to move a rail car, but Defendant Willamette was also negligent because it condoned or encouraged Plaintiff's action because of financial considerations. I cannot unequivocally say Plaintiff was more at fault in this scenario than Defendant Willamette; as a result, this issue should go to the jury.

Because Plaintiff has satisfied all of the requirements for premises liability under Tennessee law, I dissent from the majority's conclusion that the district court correctly granted summary judgment against Plaintiff on this claim. Furthermore, because Plaintiff has offered sufficient evidence as to his premises liability claim, Plaintiff's wife's derivative claim of loss of consortium should have also withstood summary judgment.